HENRIETTA SMITH, IN HER OWN RIGHT AND AS ADMINISTRATRIX OF WILLIAM HENRY CROOM, HENRIETTA MARY CROOM AND JUSTINA CROOM, AND ELIZABETH M. ARMISTEAD, APPELLANTS, VS. BRYAN CROOM, IN HIS OWN RIGHT AND AS ADM'R. OF HARDY B. CROOM, DEC'D., AND OTHERS, APPELLEES.

In a question of survivorship, arising out of a common calamity, the *legal presumption,* founded upon the circumstances of age, size or physical strength, does not obtain in our jurisprudence, either as a doctrine of the common law or as an enactment of the legislative authority. It is a doctrine of the civil law.

But, when the calamity, though common to all, consists of a series of successive events, separated from each other in point of time and character, and each likely to produce death upon the several victims according to the degree of exposure to it, in such case the difference of age, sex and physical strength becomes a matter of *evidence* and may be considered.

Smith and Armistead vs. Croom et al.—Statement of Case.

In order to arrive at a conclusion upon a question of fact, the rule of evidence does not require that there should be that amount of *certainty* which will exclude the possibility that the fact can be otherwise, but only that it shall be of such a degree, induced by appropriate evidence, as will produce moral conviction.

The term "domicil of succession," as contra-distinguished from a commercial, a political or a forensic domicil, may be defined to be "the actual residence of a man within some particular jurisdiction, of such character as shall, in accordance with certain well established principles of the public law, give direction to the succession to his personal estates."

When the domicil of origin is ascertained, it attaches to the person until a new domicil is acquired *facto et animo.*

The mere *intention* to acquire a new domicil, unaccompanied by an actual removal, avails nothing, neither does the fact of removal without the intention avail.

The place where a married man's family resides is generally to be deemed his domicil, but the presumption from this circumstance may be controlled by other circumstances.

Where a party abandons the domicil of origin *in fact* and with a present intention to acquire a new one, if he dies *in itinerœ,* and before he has consummated that intention by an actual residence, the domicil of origin immediately reverts and re-attaches.

The exercise of the political right of *voting* within a particular jurisdiction, is not *conclusive* upon the question of a "domicil of succession." It is but one of the many *criteria* which may serve to indicate the intention of the individual and may be overcome by other circumstances.

In a question of domicil, oral declarations, especially when conflicting and contradictory, are entitled to but little weight as a matter of evidence.

In a question of domicil, growing out of a *divided residence,* the entry by an individual of his name and place of residence in the register of a hotel is entitled to little consideration, especially when the entry made at different dates are contradictory.

The description which a man gives to himself in a legal document is not to be entirely discarded. It is an indication of intention, but the weight which is to be given to this species of evidence must very much depend upon the particular circumstances of each case.

The 10th clause of the Act regulating descents, approved 17th of November, 1829, (Thomp. Dig., 189,) is to be interpreted to mean an *immediate* and not a *mediate* descent from the father.

## Appeal from Leon Circuit Court.

Smith and Armistead vs. Croom et al.—Statement of Case.

This was a bill in chancery, instituted by the appellants as complainants below against the appellees.

Hardy B. Croom and his wife Frances, his daughter Henrietta, his son William and his daughter Justina, all perished by the wreck of the steamboat Home, 9th October, 1837.

Mrs. Frances Croom was the daughter of complainant, Henrietta Smith, and the sister of complainant, Elizabeth Armistead.

If any of the children of Hardy B. Croom survived him, the estate personal of that child or children, by the statute of North Carolina, goes in distribution to the "next of kin" of the child, which is the grandmother, Mrs. Smith, she being the only person then living standing in that degree of relationship to the children. To make the statutes of North Carolina operative upon the estate, the *domicil* of the child or children must have been in North Carolina. The bill therefore alleges that such was the *domicil*, and that the children did survive the father, and the personalty is claimed, therefore, for Henrietta Smith as sole distributee. Mrs. Armistead, under the laws of Florida, (which control the real estate in Florida,) would be entitled equally with her mother to a part of the real estate in Florida, she being the aunt of the children of Hardy B. Croom and the only person standing in that degree of relationship on the *maternal* side—hence Mrs. Armistead is made complainant also.

Hardy B. Croom left several brothers and one sister, all of whose interests are held by Bryan Croom, one of the brothers and defendant to the suit.

Bryan Croom administered on the estate of Hardy (who died intestate,) and qualified as such in Leon county, Florida, where Hardy B. Croom had a plantation and negroes and most of his property. He defends against the complainants' allegations and insists that Hardy B. Croom

survived his wife and children, and that therefore he and his brothers and sisters were entitled to the estate by descent and distribution from Hardy, the said Hardy having no child at his death, or father or mother; that such title vests in them whether the domicil were North Carolina or Florida.

He further insists, that even if any child or children of Hardy survived him, the domicil of Hardy, and hence of the children also, was Florida, and that by the act of 1829, the estate, personal as well as real, of an infant intestate would pass to defendants as next of kin of Hardy, through whom the infant derived the inheritance, and that all the children died in infancy.

At a hearing before Judge King, he dismissed the bill, and from this decree the appeal was taken by complainants.

Upon the question of the survivorship of the children of H. B. Croom, the following testimony was read:

Dr. John Torrey, a witness for complainants, states that he knew Mr. Croom since 1833 or '4. Saw him the day he embarked. "I considered Mr. Croom a very feeble man, who might be carried off at any moment by a slight increase of his disease." "On his last visit he was as feeble as I ever saw him," and so likewise "on the morning of his departure." "His constitution was feeble and incapable of enduring much hardship." Mrs. Croom was capable of bearing as much exertion as ladies generally, and the children also.

Dr. Hawkes, another witness for complainants, states that "he knew Mr. Croom first in the winter of 1812, when he went to college. Knew Mrs. Croom since she was a small girl. Saw Mr. Croom two or three days before he left— *the state of his health was feeble.* Was feeble from the time he first grew up. Was in college with him, studied law together and practiced together—corresponded with

him when young men—was the feeblest of all my college acquaintances, and for years past I thought him consumptive. Don't think he could have endured a great deal of fatigue. The daughter and son seemed to be hale and hearty, and as to their capacity to endure fatigue, both had a better constitution in this respect than the father—during the summer before his death, more than once under my own observation, very slight exertion was sufficient to exhaust him."

Dr. McLean, another witness for complainants, states " that he knew H. B. Croom at least 3 years before his death —knew his family—was consulted by Mr. C. professionally during the 3 years—was familiar with the state of his health up to almost the last day before he embarked in the Home; saw him a few days before he embarked. Generally speaking, as a professional man, I considered Mr. Croom as laboring under organic disease of the lungs. Considered Mr. Croom, when I first became acquainted with him, as a man in very delicate health. When I last saw him he was in a state of utter prostration and incapable of much physical exertion beyond a short walk, arising from the disease above already mentioned. On the last visit he made to New York, he was decidedly worse, and as near as I can recollect, up to the time of his embarkation in the Home. My grounds and reasons for these opinions are a critical examination into the symptoms of his complaint, which I considered a disease of the lungs from the commencement. His remarks about his own health were not satisfactory to me; he did not consider his lungs organically diseased, not being willing to admit a pulmonary irritation such as cough, hurried respiration. occasional fever. I saw him repeatedly under the same roof at Saratoga, where I had daily professional intercourse with him for some weeks. During his other visits to New York, I had occasion to see him at my own house and his.

He was in a state of utter prostration when I saw him last, which was a few days before he embarked, incapable of any physical exertion beyond that of mere locomotion.

" As far as I was acquainted with his family, each of them possessed more physical power to save themselves from impending danger than he had. The children were in the possession of full health. I cannot speak particularly as to the health of Mrs. Croom, but she appeared to be in ordinary health. The son and daughter of Mr. Croom had physical capacity to encounter the difficulties of the shipwreck which people of their age and health usually have."

The witnesses who were passengers on the " Home," and who knew Mr. Croom, all agree in their testimony that he was in feeble health.

B. B. Hussey, a bookseller and stationer of Charleston, also a witness for complainants, states that he became acquainted with Mr. Croom and family on the boat; was introduced and describes the members of his family, including Mrs. Camak; he says Mr. Croom was feeble and appeared in bad health ; the storm was for 36 hours and the boat struck at night ; about midnight of 9th October. The passengers began about sunset at the pumps and `baling ; they were much exhausted and they continued till they found it dangerous to stay below ; did not see Mr. Croom thus engaged, although he might have been ; they worked in companies and some of the ladies worked.

After the boat struck, he saw many passengers he did not know. Saw H. B. Croom, with a lady on each arm, standing near the main shaft of the engine, in the gangway, with their faces towards the larboard side of the boat and their backs to the engine; behind them was the little boy whose voice he recognized as the son of Mr. Croom, who was crying and calling to his father to save him.

A dim light was in the gangway by which witness could

see, though not very distinctly, (speaks positively as to identity of the persons.) When witness saw them the waves had stove in the starboard wheelhouse, and also the paneling that enclosed the engine on the starboard side, and the sea had commenced staving away the panels immediately behind Mr. Croom. Every blow came with tremendous violence and broke away a part of the framework. Before witness left this part of the boat, there was no protection from the sweep of the breakers. As the panels had broken in first from the bow, the passengers had retired gradually as far as they could get towards the stern. Here they were hemmed in by fragments of the stern and dining cabin. As the stanchions on the starboard side yielded, the upper deck began to lean downwards and split in pieces. Witness climbed through the seams, and with the assistance of some one below, got his wife through also. Perhaps one or more might have come up—not certain. Witness then drew up Mrs. Schroder, lashed his wife and Mrs. Schroder to the brace. Seeing a large parcel of the wreck alongside, which he thought would be safer when he should be thrown into the sea, he merely stepped on to it, when it got an impulse which carried it away with witness. After being buffeted about, being sometimes off and sometimes under the piece of the wreck, he reached the shore.

Mr. Croom and family were with witness towards the stern. Heard the boy calling to his father in words like these: "Father, you will save me, won't you, father?" "You can swim ashore with me, can't you, father?" No reply was made. Witness' impression was that he was so absorbed in the scene he did not notice the boy.

There was no boy witness could have mistaken for him. Mr. Croom must have been crushed or drowned in the passage where he stood.

He describes the dress as well as he remembers ; speaks of H. B. Croom having a handkerchief to protect his mouth and face ; witness says the moon shone occasionally ; no rain ; dining cabin first went ; possible but not probable that one might have survived some time floating, if one could have got outside the breakers, but this was not possible ; the boy was not quite so much exposed as the father ; witness was saved on a piece of the wreck which was part of the covering of dining cabin ; the piece was as wide as the cabin and longer ; there were a few persons on the boat when witness left ; the other two female members of Mr. Croom's family witness supposes were lost.

Andrew Lovegreen, of Charleston, also a witness for complainants, states, that he saw great many passengers crowding from the dining-room towards the gang-ways between the engine and wheel-house ; they must have been crushed by the falling of the after or dining cabin ; not half of the passengers ever got on upper deck ; they were crushed or washed off and drowned before the upper deck fell in ; was on gallows frame with 6 others, and was the last that left the vessel ; did not know the Crooms, but if they were either in the gangways below or in the cabin, they must either have been crushed or drowned before witness left the boat ; the boat went to pieces in 15 minutes ; from the time he left the boat till he landed was about half an hour.    An expert swimmer might have lived about twenty minutes without the aid of some floating substance to support him, but the breakers were so furious that he, although an excellent swimmer, was nearly overcome, although he had to swim only about five to ten minutes.

Mrs. Schroder, also a witness for complainants, says that the last time she saw Mr. Croom he was coming out of the dining cabin with two ladies on his arm, one of whom was Mrs. Croom and the other she judged to be the sister of said lady.  Running before was their little daughter, about

twelve years of age.    Afterwards she saw a lad, their son, of about fourteen years, clinging on to the tiller-rope next to her.    One lady, whose name was Miss Henrietta, was about seventeen.    Mr. Croom appeared feeble.

Saw Mr. Croom with the two ladies and little girl.  She had lost sight of the young lady.

Great many passengers in the dining room after the boat struck; great many were swept off.    Heard captain say the boat was strongest in the middle between the wheel-house and machinery.    Most of the passengers were burst-ing out of the dining room when the sea broke over the boat.    Little boy cried to his father—no answer.    Witness believed that at that time he was swept away.    Candle in dining room and lamp over the door leading to the engine room—could distinguish persons.    Saw the boy as long as an hour after she saw Mr. C. and rest of the family.    No boy she could mistake for Master Croom.    Witness climbed through the opening of the deck on upper-deck, and was saved on piece of the timber.    Some persons were on the part where the bell is when she left the boat.

Mr. Bishop, another witness for complainants, states, that when the boat struck, saw a dozen ladies and some few gentlemen come out of cabin door on deck; they were all swept off by the breakers; some might have been swept into the cabin on deck or washed down grand stairs into lower cabin; saw a number in the sea; Mr. Croom could not have been swept off then; saw him afterwards.    Wit-ness was standing inside of the door of the cabin on deck; was swept to the kitchen door in after part of the boat and half the width of the boat from the cabin door; don't know where most of the passengers then were.    Witness found no one in after part but himself; thinks the others were swept off into the sea; after this he saw Mr. Croom and his son against the kitchen door, where witness saved him-self; the boy appealed to the father to save him, and he

12

replied it was impossible to swim; never saw Mr. Croom afterwards, and should say, from the circumstances, that he was taken off by the sea before the boat went to pieces; before the breaker passed he saw the two, and after it passed saw the boy alone, and never saw Mr. Croom afterwards; did not see any other of the family after he missed Mr. Croom; was saved on piece of the wreck on which the boy was; three-quarters of an hour getting ashore; when he left wreck does not believe anybody was on it; the last he saw was Master Croom; saw him drowning; the portion of the wreck on which they were had grounded and he, the boy, was swept off; the stern went to pieces first, the fore part next; the middle last; the gallows frame was the last that fell, and the same breaker took off the wheel-house; the next took the portion where witness stood, which was the leeward side and a portion near the wheel; the last I saw perish was Master Croom; witness and young Croom were on the part of the wreck on which they floated before it parted; when witness left there was nothing but *the boilers* after gallows frame and wheel-house fell; possible, but not probable, that H. B. Croom survived the son; Mr. Croom was engaged with the passengers in bailing the boat, handing round buckets.

Conrad Quin, of Jersey City, also a witness for complainants, states that he was by the cabin door as you go out; Mr. Croom stood on the lee side near cabin door as you go out; his family were in that cabin on deck; heard the son ask the father to swim with him; heard no reply; Mr. Croom was standing near cabin door; did not see him afterwards; witness stood about middle of the boat, 7 or 8 feet off, when the boy spoke; Mr. Croom was taken off with the sea at the time the breakers were washing away the cabin; witness went to leeward side of boat and got on wheel-house; about a dozen were on the fore-castle, the Captain among them; most of the passengers were there;

did not then see Mr. Croom, nor did he see him after the deck cabin was swept away. While witness was on the wheel-house a young lady came up, who was Miss Croom; she came on to wheel-house and held on to same piece of timber witness did, and stood there about five minutes, and said she would give $5,000 if anybody would help her get ashore; she was washed off with wheel-house; knew it was Miss Croom; saw her before the storm with her father and brother, and the boy said it was his sister; saw no persons on the boat when he left; saw no one on it or around it; looked to see; saw the daughter after missing Mr. Croom.

Henry Vanderzee, of Charleston, also a witness for complainants, states that he was on the upper deck in after part of the vessel; did not see Mr. Croom's family there; recollects no boy he could have mistaken for Master Croom; saw none of the family until he got on the floating piece, where he found the boy he took to be young Croom, 11 or 12 years old; there were on this piece Bishop, Cady, Johnson, the boy and witness; Master Croom was drowned in attempting to reach the land after the piece had grounded; the last part witness saw standing was the gallows frame, just before he went overboard; some persons were on that; the last of the family witness saw was young Croom; in attempting to get ashore he was carried out to sea; witness thinks he, witness, was one of the very last who got ashore, from the fact he was one of the last who went overboard; in witness' opinion, a large proportion of those who were lost had perished before witness got ashore, and thinks so because he was one of the last who went overboard and was on a large piece of the wreck; witness went overboard with Mrs. Schroder, but left that piece; boat went to pieces in a few minutes; thinks the wheel-houses had been carried away before he left; thinks he could have seen a lady on the wheel-house; knows of nobody except young Croom who was lost after

getting on piece of wreck; was about three-quarters of an hour getting ashore.

J. D. Roland, of Columbus, Ga., a witness for defendants, states that he was a passenger on board the Home. Including the crew, there were about one hundred and forty persons, of whom about forty were saved. The boat struck the ground about the third of a mile from the shore. The night of the wreck was moon-light, but it was cloudy. There was no bright moon during the night. Could see the shore when the boat grounded; boat went to pieces soon after she grounded. Witness thinks he was an hour and a half reaching the shore. Did not know Mr. Croom or any of his family, nor did he see them that he is aware of. He saw no lamp after the boat struck. Portions of the wreck and baggage were strewed along the shore for two or three miles. Witness and others landed about a mile down the coast from the nearest point of the coast to the wreck. Saw Mrs. Schroder on the shore the next morning—did not know her on the boat. Witness does not believe that in her situation she was capable of telling with certainty and precision what became of the persons on board the Home, how they perished and how others escaped. Mrs. Schroder might have had better opportunities than witness for observing the movements of the Croom family.

Thomas S. Singleton, of South Carolina, also a witness for defendants, states that he was present when other persons were conversing with one of the passengers on the "Home," a bookseller, and making inquiries about Mr. Croom and family. The impression left on the mind of witness from what he heard the bookseller state, was that Mr. Croom and family were on board the boat. Witness states that in 1835 or 1836, Mr. Croom, with witness and others, went in swimming in the Neuse river at a point where it is said the river is about a mile wide. They waded into

swimming water, and witness believing he was the best swimmer in that part of the State, he " calculated he would go ahead with the concern," but found that it was all he could do to keep up with H. B. Croom. When witness and Mr. Croom got half way across the river, witnessed proposed to Mr. Croom to return which they did and overtook the rest of the party before they got to walking ground.

W. S. Blackledge, of North Carolino, also a witness for defendants, states that he did not converse with any of the passengers of the " Home." After they reached Newbern, the hope was entertained that Mr. Croom and family had not been on board, as it appeared that none of the passengers were acquainted with him and family, and this fact was so stated in the paper published in Newbern at that time.

Matthias E. Manly, of North Carolina, also a witness for defendants, states that he conversed with some of the passengers—remembers a Mr. Green and another, a dealer in books and stationery residing in Charleston, whose name he could not recall. None of them appeared to know Mr. Croom or any member of his family. The latter of the two referred to recognized points of identity in the description given him of Mr. Croom and family, with persons noticed by him on board the " Home," and added descriptions of his own which led a number of persons to conclude, and witness among the number, that Mr. Croom and family were passengers on the lost steamer. There was an uncertainty upon the point, however, throughout the circle of Mr. Croom's friends in Newbern until a list of passengers from New York put an end to the suspense. Witness further states that he saw a lady called Mrs. Schroder, but remembers no conversation with her or in her presence in relation to Mr. Croom and his family. Has no recollection of the names of Henry Vanderzee and John Bishop as among the survivors he conversed with.

Defendants also read in evidence the following statement of John Bishop to impeach his recollection of the facts detailed in his examination by complainants, viz:

"ATHENS, September 29, 1838.

" I was a passenger on the steamboat ' Home,' when she was wrecked on the passage from New York to Charleston, on the 9th day of October, 1837. I had observed Mr. Croom and his family in the boat a short time after we left New York, but had never, as I know of, seen him or any member of his family, before. I learned his name about three o'clock, P. M., of the day on which the wreck took place, from hearing other persons calling him by name, and his replies, etc. Mr. Croom seemed to have under his charge a lady, who I also understood was his wife, a young lady, a little girl, and little boy about thirteen or fourteen years of age, whom I heard called young Croom, and therefore supposed him to be the son of Mr. Croom. Mr. Croom, and those persons under his charge, occupied, a greater part of the day, a position near the door of the dining cabin, he, Mr. Croom, working occasionally at the pump. A short time after the boat struck, and about ten or twelve minutes before the boat went to pieces, I saw Mr. Croom and the aforesaid little boy, moving together, and alive, on the main deck, immediately on one side of the boat, as if looking over that side of the boat. I was on the promenade deck, the highest part of the boat, nearly directly over them. I heard the boy talking to Mr. Croom about swimming, and Mr. Croom reply that it was impossible for any one to swim on such a sea as that was. At this time I discovered a breaker in sight, coming in the direction of the boat. I turned to make fast myself, and in a few minutes after the breaker had past, I found the little boy with me, holding on. I saw nothing more of Mr. Croom after that. He had a good chance to keep himself from being carried off by the breakers, as

there were several things for him to hold to, and the break-
er struck the boat on the opposite side from where he was
when I last saw him. I know of no one being carried off
by that breaker. I noticed the place where Mr. Croom
and the boy was standing, after the breaker had passed;
it seemed to be much shattered and broken to pieces, but
I saw no person floating, nor any appearance of that kind.
At this time the gangways, both lengthwise and crosswise
the boat, had not been so much injured but that persons
might pass easily. The boy and myself continued to hold
on, at the same place, until another breaker had passed,
at which time that part seemed to be giving way, and I
moved, he following me to the other side of the boat, and
a little forward on the same deck, and on the approach of
another breaker, the boy held on with me to the same
piece; at this time the part of the promenade deck on
which we were, separated from the boat. This part of the
deck was the last to separate; the fore part, as well as the
part behind, had a few moments before floated off. The
part of the deck behind seemed to break up into smaller
pieces, and to float in all directions. Many of the frag-
ments of that part of the deck were of sufficient size for
any person to have floated on them, and to have sustained
them well; so were a great many other parts of the boat,
which were floating, likewise, in almost every direction.
The part on which I was, also, the boy and some other gen-
tlemen, floated in the direction of the beach, and came
within eighty or a hundred yards of the shore, when the
little boy was swept off the wreck by the return of the
water' which had just been carried ashore by a heavy wave
or breaker, and was carried back to sea. I saw him float-
ing out to sea, seemingly upright, with his face towards
the part of the wreck from which he had just been car-
ried, and distinctly heard the water in his throat, as if
strangling. This is the last I saw of him. When the next

breaker came I went ashore on it. It was about fifteen minutes from the time I saw Mr. Croom and the little boy, as aforesaid, on the deck below me, until he was carried off the piece of wreck, as I have just stated, and in that drowning condition. During that time, it being cloudy, a person could not be seen at a distance of thirty feet, except about two minutes, when the moon shone very bright, which was a very short time after seeing Mr. Croom and the little boy on the side of the boat, as I have stated. I saw no person after I saw, as before stated, Mr. Croom and the little boy on the side of the boat, until I went ashore, except the persons on the part of the wreck on which I was saved.                    JOHN BISHOP."

Upon the question of the Domicil of Hardy B. Croom and his children, it appears in the pleadings and proofs that he was born in the County of Lenoir in North Carolina, where his father lived up to the time of his death; that he was educated at Chapel Hill; that he studied law in Newbern and practiced his profession there, or in that vicinity, in early life; that he was married about the year 1821, in Newbern, to Frances Smith, daughter of Nathan Smith and of Henrietta Smith, one of the complainants. Nathan Smith died within a year or two after this marriage. In the division of his real estate in Newbern, his family residence was allotted to Justina, a minor and sister of Mrs. H. B. Croom, but Justina died in infancy shortly after, and on a division of her real estate in Newbern, three-eighths of the said family residence fell to Mrs. Croom, three-eighths to her brother Nat. Smith, and one-quarter to Mrs. Armistead, the sister of Mrs. Croom and one of the complainants, Henrietta Smith, the widow of Nathan Smith, having a claim of dower in the whole. Nat. Smith, brother of Mrs. Croom, conveyed in trust for the benefit of his sister Mrs. Croom, his three-eighths of the family residence, enlarging Mrs. Croom's interest to

three-quarters. In this house in Newbern the family of H. B. Croom resided up to the time of his last departure from Newbern in the summer of 1837, and in it were found after his death the furniture, &c., usually in use by the family.

In 1828 H. B. Croom represented the County of Lenoir in the Senate of North Carolina, and he at that time and before had a planting interest in Lenoir.

William Croom, the father of Hardy B. Croom, had established some planting interest in Florida previous to his death, which occurred in May, 1829. Bryan Croom, the brother of H. B. Croom, had settled in Florida as early as about 1826, and at the time of the death of his father was planting in Gadsden County, Florida. Hardy B. Croom was left one of the executors of his father's will. He came to Florida in the fall of 1830 with the purpose as disclosed by his antecedent letters of attending to the business of his father's estate in Florida, and in the hope of establishing himself in some way there, to promote his private fortune. In a letter dated Rocky Comfort, Nov. 23, 1830, to his wife at Newbern, he speaks highly of the country, and says that one hand can make as much as two in North Carolina. In a letter dated at Rocky Comfort, 24 March, (supposed to be 1831,) he says "my mind is now constantly looking towards home. How I desire to be there you can well imagine. Where wife, children, friends and home all combine their attractions, the influence must be strong indeed."

May 17th, 1831—He is at Charleston going home; he writes to his wife, "My patience is worn thread-bare and my anxiety to reach home is intolerable."

June 5th, 1831—H. B. Croom is at Newbern and writes to his brother Bryan in Florida; he says, "I arrived at home 20th May."

13

July 11, 1831—He writes again from same place, saying, "My wife is willing to go to Florida," &c.

Oct. 10th, 1831—He again writes from Newbern to his brother; says, "I have determined to start two-thirds of my hands." "My family will not go out this year," &c.—"I shall make arrangements for next year."

Oct. 27, 1831—Hardy writes from Lenoir to Bryan that he has sold his plantation and intends to send out all his negroes, &c.

Dec. 14, 1831—Hardy is in Florida, his negroes having arrived before him, and writes from Rocky Comfort to his wife at Newbern; he speaks of the employment of his negroes in Florida, and says, "I have concluded to occupy and cultivate in cotton the place my father bought near Bryan's with part of the hands, and employ a part with a part of Bryan's on the river, in making sugar."

H. B. Croom effected some arrangement with his brother for a joint planting interest and left his slaves in Florida. In the Spring he left for New Orleans via Montgomery, and returned thence to Newbern by way of Philadelphia and Baltimore. His letters from New Orleans of the 27th April, 1832 and 13th May, 1832, show that he was engaged in looking at the country west and he gives his views of Alabama and Louisana and goes so far as to entertain a proposition for a large purchase of land in Louisiana and to submit it to his brother Bryan's consideration.

June 4th, 1832—Bryan Croom at Rocky Comfort replies to Hardy's letter about the Louisiana lands by letter addressed to Newbern, and says, "Hope you may be well and at Home." "At a loss to write about the speculation you speak of in Louisiana, not having seen the lands," &c.

Hardy arrives at Newbern and writes his brother on the 22d July, 1832. He says among other things, "My health continues to improve and Newbern to decline. You can't conceive how the place has altered. Mrs. Smith and

all the family would move out if it were not for Mrs. Armistead."

Aug. 1st, 1832—He writes again from Newbern to his brother Bryan. After discussing matters of business he says, "I hope to leave Carolina on my return about the 1st October; I expect to carry out my family.

On the 17th Aug. he writes from Newbern to his brother Bryan and says, "Shall carry out my family and you will be surprised to learn that Mrs. Smith has resolved to go out with us and Henrietta will accompany her mother. Mrs. Smith wishes to see the Southern Country and it seems to be her wish that all her children should remove there as she wishes to leave them in prosperous circumstances. Not one of them offers any objection except Mrs. Armistead. If Mrs. S. should not be pleased with Florlda, I should wish her to see southern Alabama."

He then speaks of arrangements for their accommodation at Bryan Croom's house, and says, I shall ship part of my furniture and books to Charleston, and thence to Florida.

Before the close of the letter he says, " We have altered our plans and Mrs. Smith will not go out until next Fall, by which time she can settle the business of her son's estate and make disposition of some lands. Mr. Smith left no valid Will, (this is Nath'l. and not Nathan Smith.) The heirs have given all the property to Mrs. Smith and she will divide it at her death. She has already given Wm. Henry a present of three negroes."

P. S.—Aug. 20th—I shall leave Henrietta Mary here and only carry the two younger children.

14th Aug., 1832—Bryan writes Hardy and rejoices at his arrival at home. "I would impress you seriously with thinking of moving to Florida."

On the 6th October, 1832, Hardy is yet in Newbern, detained by sickness. He says, "I am very desirous to be with you and am resolved to remain 12 or 18 months at

least.   Next May I think of looking at Alabama and perhaps you will accompany me."

Jan. 20, 1833—Mrs. Smith writes H. B. Croom at Rocky Comfort and expresses pleasure to learn he had arrived safe at home—meaning Florida—with improvement of health to him and Wm. H.   "I still continue in the same mind to go out with you next Fall.   We spent a pleasant evening at your house last night."

Jan. 11, 1833—Mrs. Croom writes Hardy B. Croom: "Mama told me to tell you she was preparing with all haste to emigrate with us ;  I have not heard sister say what she intends to do.   It seems though almost a pity to leave our State just as times are getting better—our wharves are beginning to present a much livelier appearance than they have in many years past.   Tell them (Bryan and his wife) I shall be glad if we can be near neighbors when we all get out there."

Feb. 26, 1833—Mrs. Armistead writes from Newbern to Hardy in Florida an affectionate letter and delivers messages from old Mrs. Smith that he must "come in" as soon as he can.

On the 20th June, 1833, after his return to Newbern in the Spring he writes his brother Bryan—" Things are insufferably dull here and with nothing to do.   I already desire to be on the road back to Florida, and were it not for the heat of the weather it would not be long before I would be so.   I believe that things get constantly worse here ; town property is worth almost nothing.   Mrs. Smith is gone to the North and it is uncertain when she will be back—probably not before September.   I begin to find that all her promises to me are moonshine, which is the worse because they were made for a valuable consideration.   Be that as it may, I leave here in October next, never to return ; those who stay behind will not see me again unless they come to Florida—I have been trifled with long enough."

"I have not yet been to Lenoir; I shall go up in a week or two and make arrangements for carrying out the few negroes I have there," &c.

"I do not know whether I will carry her (Henrietta Mary) out now or leave her for the advantages of education."

Again, 2nd Sept., 1833, he writes his brother in reference to their busines in Florida—speaks of sending out from Lenoir the rest of his negroes. He says also, "I think it very probable that Mrs. Smith will not return from the North before my departure for Florida. I have no idea now that she intends moving or ever did."

9th Oct., 1833, he writes again from Newbern to his brother. He says, "I have engaged a young man to travel "with my negroes;" and in a P. S., "Wm. Henry will ac- "company me, and perhaps Henrietta Mary, who is so anx- "ious to go that I know not how to refuse her."

Hardy B. Croom proceeds to Florida with Wm. H. and on the 9th Feb., 1834, Mrs. Croom at Newbern writes to Hardy at Rocky Comfort, his brother Bryan's residence.

She makes warm expressions of her affection and interest in the health of her husband and son; says Mr. Bayard recommends him to see Alabama and recommends Mobile as a place suitable for Hardy Croom. She continues—"Suppose, before you settle permanently, you give yourself sufficient time to judge."

"You did not mention in what part of Florida you have settled, and recollect you were to write to Ma a description of your plans, for she would not feel advisable in doing anything of the kind without understanding the step she would take."

"Ma desired me to mention that the winter has been very trying with us, but that she is getting along as fast as she can with her business—that she is determined on leaving North Carolina."

She writes again on the 24th March, 1834, in a post-script

to a letter of Henrietta Mary to her father. She says, "Tell me in your next what your designs are for next year and what I shall do until your return, as I have been keeping house ever since you left and you can imagine the rest.— Newbern is very dull, and I have little more to tell you than I mentioned in my last, that we all continue in the same mind and are getting ready as fast as we can," &c.

She writes again on the 15th April, 1834,. in which she says, " Ma is looking for her letter from you describing your purchase in the land, and taking an enthusiastic interest in us," &c.

March 21, 1834—Hardy writes from Lake Lafayette to his wife expressing the thought that she would be pleased with his plantation. He says, "You may expect me at home by 20th April."

Sept. 24th, 1834—H. B. Croom had returned to Newbern and under that date writes a kind letter to Mrs. Smith at New York which contains nothing definite as to his or her movements. He says, "I arrived at home," referring to Newbern. "William says you must come home."

On May 1, 1835, Hardy is at Macon with his brother Bryan who is sick. Hardy writes his wife to Newbern, saying he will take the Stage and not continue on in his brother's carriage, so as to "expedite my arrival at home."

July 29th—Hardy is in New York and writes his wife to Newbern saying, "I am now ready to go home."

Aug 16, 1835—Hardy at New York writes Judge Baltzell at Tallahassee to rent or buy his house in Tallahassee for the next season. He fails to obtain Judge Baltzell's house.

Oct. 6, 1835—Hardy at Newbern writes to Dr. John Torry at New York, in which he speaks of forwarding a small collection of plants. He says, " This collection contains but a small variety. It is however, such as my time and oportunities since my return home, have enabled me to

make." Speaks of setting off for Florida in a few days and of visiting Alabama during the winter. In a P. S. dated Oct. 9th, he says, " Day after to-morrow I propose starting on my annual peregrination to the South. These journeys though long, are a good deal enjoyed; how much more would they be if I had the company of one like yourself who should be 'my guide, philosepher and friend,' at least in Botany."

4th Nov., 1835—Mrs. H. B. Croom writes to Hardy at Tallahassee—dates from Newbern and speaks of her pleasant anticipations in enjoying rambles in the wilds of Florida, and wishes they could transport their comfortable house in Newbern "where we are to settle."

On the 8th of the same month Hardy writes to his wife dating his letter at Tallahassee. He says of Florida—"It is a good country for planting and merchandize, but I cannot say it is a desirable country to live in; I have pretty well concluded not to settle here, but to make all the money I can and lay out none for building."

"They" (Mrs. Smith and Mrs· Armistead) "had best remain there," (Newbern.)

"Augusta is a fine place and there or at Charleston I would like to live if we could all agree on it."

" Great pity to sacrifice all the good. property they and we have in North Carolina.

Dec. 29, 1835—Mrs. Croom at Newbern writes Hardy at Tallahassee and advises him that her sister Henrietta is about to marry Mr. Carroll, a merchant of New York.— suggests that Mr. Croom shall ship his cotton to his house ; says she would like to have a good house in Florida but dreads the expense as it would be better in negroes; says her sister(Mrs. Armistead) has an idea, if her negroes don't hire well, to send some out by William Croom to Florida ;. says Henrietta thinks that they (" we") may take a house together in New York and Hardy (" you") and Mr. Carrol

may assist each other in business; she says—"They all talk of moving there and if that should be the case it would be better to defer building in Florida this next year until we see what better or more to do;" sends her love to the negroes and to "tell them to have all things ready against I come out there."

Jan. 12, 1836—Hardy at Tallahassee to his wife, after encouraging accounts of his crop, he says—"I have some hopes, though they are not strong, that Mrs. A. and perhaps some of the others will send out their negroes.

I have some wish to take a look at Mobile before I return to Newbern, but I am desirous of returning home earlier than I did last Spring if it be practicable.  *  *  Mr. Geo. Whitfield is here with a considerable part of his negroes; he likes the country very much."

Jan. 26, 1836—Mrs. Armstead, Newbern, to H. B. Croom, Florida: Had I known that you wanted the negroes yourself, at all risks they should have been sent. Thanks him for his offers to attend to her interests in Florida; writes about the marriage of Mr. Carroll; post-script from Mrs. Carroll.

Jan. 30, 1836—Hardy at Rocky Comfort to his wife; acknowledges receipt of her letter of 29th Dec.: "On reflection I have concluded that New York is to cold and too far from our business, and I now think that we will settle in Charleston where the winters will not be too cold for me nor the distance from Florida too great. The society of Charleston is equal to any in the United States. Bryan is willing to go there also, and perhaps Dr. Bellamy and others of our old friends may follow; I shall therefore only build a temporary house in Florida to give us shelter when we visit the plantation during winter. Should we go to Charleston next Fall we can take our children home and educate them under our own eyes, which will be a great comfort.

P. S.—*  *  I am not quite decided between Charleston, Columbia and Augusta, but think that the first will have preference.  Columbia has a college to recommend it and so has Charleston.

July 8, 1836—Bryan at Rocky Comfort to Hardy at New York : It (" our stay in Fla.") will have the good or bad effect of hastening my change of residence ; I feel convinced now that I cannot be satisfied with a summer life in Florida.  The determination to alter my residence is the only thing that cheers me now ; I still think of Augusta and shall be glad if you continue of the same mind ; you nor your family can never be satisfied here.  I propose to meet you in Augusta about October next and make some arrangements preparatory to moving there next Spring ; we may buy if we find houses to please us, or rent for the present and build to suit ourselves.  You must get a drawing of those buildings at New Haven that you admired so much or some other buildings that please your fancy.  Augusta offers ample advantages to your children at present and will be an agreeable home for them hereafter.  Think seriously of this for I must go some where and should like for us not to be separated.  We have been a good deal harrassed by Indian alarms but have never regarded them and shall not."

July 28, 1836—Hardy, New York, to Bryan, Florida: I arrived in New York with Fanny and Justina ; Mr. and Mrs. Carroll have just gone to keeping house; we will stay with them after a day or two. I am desirous of renting the Carruthers place, near Tallahassee, both land and house, but particularly the house, which I should like to have the use of when I reach Florida ; I wish you would take means to secure it for me if it can be had.

Aug. 15, 1836—Bryan, Rocky Comfort, to Hardy, New York : I am pleased to hear of the good health of your chil-

14

dren; would it not be prudent for them to spend the next winter South—Augusta or Charleston? I have had a sad time of it this summer; I am perfectly worn down with ennui and disgust, (perhaps you would say worn up); a plague on sighing and grief; it puffs a man up like a bladder. You did not seem to sympathize with me enough— the object nearest my heart is to live hence in some decent place and have your family near us and others of your friends who would like. You have never spent a summer here and can form no idea of the poverty of the country.— There is not one barrel of good Flour in the whole of Middle Florida; I have sent to Quincy, Mount Vernon, Tallahassee and St. Marks, and have returned without any; five hundred barrels sour Flour in Tallahassee—not a Bacon ham, no fruit, not a bottle of lime juice; we are living now upon black bread and stinking shoulders and wire-grass beef, and if you had the wealth of Crœsus, why you could look at it. Besides a man rusts here as well as rots, and if you make up your mind to raise a family of Casper Hausers, you may turn it to advantage in the city of New York at some future day. I am full of spleen you see, but it is because I am dwelling on the prospect and reality; place your family here and you have the picture before you—we are all apples.

My mind is firm and I have been deliberate; I have mentioned Augusta—some other place of equal advantages would suit me as well.

Sept. 29, 1836—Bryan, Rocky Comfort, to Hardy, Newbern: I received your letter of the 11th yesterday and reply now that my letter may meet you at Newbern. I shall leave here for Augusta in about a week; * * will wait for you and shall be in no hurry to return to Florida—we are keen to be off; I shall go there perfectly unbiased between Augusta and Charleston.

Hardy B. Croom to Bryan at Augusta:

NEWBERN, Oct. 13, 1836.

We have been here little more than a week since our return from New York, and have been busily engaged in making preparations for our journey south, for I have concluded to carry my family out and to ship my furniture to Charleston as there is a vessel now in port for that place. I have bought horses and pedlars' wagons to carry our servants out and I had a prospect of getting off in the course of a week, but Mrs. Smith arrived last night from New York and makes so unfavorable a report of William's situation at school that I have concluded to go immediately and bring him home. The trip to New York and back will occupy me about 10 days, but will delay my departure hence only four or five days. I hope, still I fear, that you will hardly have patience to wait our arrival at Augusta, and in that event I wish you and Eveline to go down to Charleston and examine for yourselves. Ascertain (if you like the place) the practicability of renting good dwelling houses, the prices, &c. If you like Charleston, I give you carte blanche to act for me in engaging a house, &c. I shall regret if I cannot be with you in Charleston.

Hardy B. Croom to J. B. Carroll, New York:

NEWBERN, Oct. 18, 1836.

It is probable that Mrs. Croom and Mrs. Camack will not go further than Augusta, and will spend the winter either there or in Charleston, at one of which places my brother Bryan and myself intend to settle—he will meet me at Augusta on my way out. The children therefore, can be sent to school at one of those places. I will make a visit to my plantation and return as soon as I can to my family.— My brother and family will probably join us, and before the next spring we will be settled I hope in one of these places. I prefer Charleston myself and shall use my influence with

my brother in its favor; this being the case I will make an alteration in the disposition of the things we left at your house. You may send them all to Charleston. You need not hurry in the matter as any time in the course of a month will answer; consign them to Messrs. J. & C. Lawton, Charleston.

The rest of the letter relates to the purchase of a negro from Hollister, and directs his coach to be shipped to Charleston; speaks also of sending there from Newbern a negro woman and children.

NEWBERN, Oct. 17, 1836.

Hardy B. Croom to Dr. John Torry, New York:

We arrived here safely nearly two weeks ago and have since been much engaged in making preparations for my departure South. I am about to break up my establishment here and to transfer my family further South. I do not propose to settle them in Florida, but probably in Charleston where I can more conveniently visit my plantation in winter, and where I shall enjoy a more cultivated society and greater literary means than I can elsewhere find at the South. If I should find the climate oppressive during summer, I can easily transfer myself and family to the North for two or three months in each year or two; here too I can have my children with me and the means of educating them at home, which you will allow is no small consideration. I am now really unhappy on account of their absence from us.

AUGUSTA, Nov. 18, 1836.

Hardy B. Croom to his wife in Newbern:

I came to this place thinking to meet brother Bryan here, but am disappointed. I find here a letter from him stating that he thought it imprudent to go to Charleston at this present an account of the Cholera, and proposing to postpone our visit there until the latter part of January. I will therefore proceed on to Florida.

Bryan and myself will go to Charleston in December or

Smith and Armistead vs. Croom et al.—Statement of Case.

January and I think will take houses there.    I can then go
on to Newbern and bring you on to Charleston.    Cousin
George was detained for five days, but got a seat at last
and overtook me before I reached this place; I have invited
him to take a seat with me and he will do so.

NEWBERN, Nov. 24, 1836.

Mrs. Croom to her husband, Hardy B. Croom, Tallahassee:

Although I am as anxious as yourself to be united, yet it
appears to me that too hasty an introduction into a diseased
air might be prejudicial.    I only mention it that you may
consider the  consequences that might attend moving to
Charleston this winter, or to where the Cholera has so long
prevailed, as it is an affection I think much to be dreaded.
Waive that objection and I've ever been anxious to try a
different air, and I don't know a place I would be more wil-
ling to move to this winter than Charleston, and it cannot
be too soon.

NEW YORK, December 3, 1836.

Mrs. Armistead to Hardy B. Croom, Tallahassee:

" You will be surprised to receive a letter dated New
York from me."

(Expects to go to Carolina in a few days, &c.)

" Ma received a kind satisfactory letter from you dated
a few days previous to your leaving for the South ; she will
answer it soon.    I have delayed replying to my part of the
letter, from the wish of first getting home to see how things
were there and to receive the letter you promised to write
to me on your arrival in Florida, respecting the Indians.

(Speaks of her looking about for a house—great pres-
sure for money—dislikes, under the circumstances, to incur
any pencuniary responsibility.)

Under these considerations I think you can manage bet-
ter when you come on in the summer. Property will by
that time have acquired a fixed value, and your judgment

is so good and you are so lucky at a bargain, I think we had best wait till you come on to see about it, though I feel very much flattered by your gratifying offer, and if I knew how, should be glad to avail myself of it. How much I wish me and my belongings in Florida with you at this moment you cannot know, but as soon as I reach home you shall hear from me concerning the negroes; I shall certainly send them if I can make arrangements for their going. We got a letter from sister Fanny last week—they were all well and in good spirits.

FLORIDA, Dec. 6, 1836.

Hardy B. Croom to his wife, Newbern:

I am glad to inform you that brother Bryan has come into my views of settling in Charleston, and we intend to go there some time in January to procure dwellings, after which I will proceed on to Newbern to move you and aunt thither. I am looking forward to this period with a great deal of pleasure and with some impatience. I shall, however, have the intermediate time so much occupied, as not to feel it so sensibly as I otherwise would.

Mrs. Armistead can get good wages for her men here, but I don't want her to send them on my recommendation. If she will sell them and deliver them here, I would give her a good price.

One of the bay horses got quite poor on the journey. As soon as they are sufficiently recruited I will send Edward back with the Barouche—this will probably be about the 1st January.

AUGUSTA, GA., Jan. 23, 1837.

Hardy B. Croom to his wife, Newbern:

You will see by this letter that I am on my way to Charleston and thence home. Bryan and myself arrived here last evening and proceed this evening for Charleston, where we will arrive to-morrow evening. We have fully made up our minds to settle there, and I am looking for-

ward to a great deal of happiness and enjoyment when we get settled there, especially when we get all our dear children once more around us, which will soon be the case after we get to Charleston. We intend to rent houses for a year or two, and afterwards to build. As soon as we look about the city and get houses, brother Bryan will return to Florida and remove his family and I will proceed to Newbern for the same purpose. It is probable that I will leave Charleston in the Steamboat on the 9th February, which will land me at Smithville, whence I shall proceed by Wilmington to Newbern.

As I have letters to several persons in Charleston I expect to pass the time there very agreeably, and will be making acquaintances with the place and people preparatory to our going there. When I have been there a few days I will write you again.

My calculation is that we will leave Newbern about the first of March.

CHARLESTON, Jan. 29, 1837.

Hardy B. Croom to his wife, Newbern:

I wrote to you from Augusta the other day informing you of my being on the way to this place, together with brother Bryan for the purpose of getting dwellings for us and our families. I have now the satisfaction of informing you that we have been quite successful, both of us having got very good houses in pleasant and healthy situations; moreover we have ascertained from the experience of families residing here for a long time that Charleston is remarkably healthy throughout the year, there being no occasion to leave it in summer unless we choose to do so.

I expect to leave this place in the Steamboat for Smithville on the 9th February and to be at Newbern by the 14th February. As soon as I reach there we will set about arrangements for our removal and I think we will come by

the same route.　If there should be a vessel for Charleston that would take our furniture it would be very fortunate, if not we must send it by way of New York.

CHARLESTON, Feb. 3, 1837.

Hardy B. Croom to Bryan Croom, Fla. :

I will write to them (the Hamlins) about shipping my things here.

Speaks of agreeable society in Charleston, tells him of a house next to Dr. Bachman which he thinks he will prefer.

I shall go on in the steamboat of the 9th to Smithville and will return to Charleston as soon as circumstances will permit, probably some time in March.

CHARLESTON, Feb. 4, 1837.

Hardy B. Croom to John B. Carroll, New York:

I informed you in my last from Tallahassee that I was about to set off for this place in a few days for the purpose of getting a house with a view of removing from Newbern.　I have been here a little more than a week and have been quite successful in my object, having obtained one of the most pleasant situations in all Charleston.　Of course I have abandoned the idea of carrying my family to New York.

I expect to reach Newbern about 14th inst., and I want Wm. Henry sent home to me if a safe opportunity offers.

Wishes him to inform Hedenberg of Newark, who is making him a carriage, that he desires it shipped to J. & C. Lawton, Charleston.

CHARLESTON, Feb. 7, 1837.

Hardy B. Croom to Dr. Torrey, New York:

My last, from Florida, informed you that I was about to set out for this place, with a view of getting a house for my future residence.　I have been here nearly two weeks, and have been successful in my main object, having obtained a very pleasant one.　I shall depart day after to-

morrow for North Carolina, where my family is, and whence I shall return with them as soon as practicable, probably in the course of a month. Can you not let me hear from you in Newbern? There is now a hope, but not a certainty, that the Indian war will be brought to a close this spring.

ROCKY COMFORT, March 7, 1837.

Bryan Croom to Hardy, at Newbern:

"I wish you would get to Charleston as soon as you can, for I should hate to be there without money and without friends. I expect to leave here in about eighteen days."

NEWBERN, March 13, 1837.

Hardy B. Croom to Mrs. Armistead, New York:

I wrote you a few days ago and you will perceive that I have in some measure anticipated your conclusions—I mean in regard to your continuing in New York. When we get established in Charleston, and you in New York, I think we will be in a situation to enjoy life and society, as we can alternately visit each other in the appropriate seasons. I do hope that you and your Ma will sell out here and send your negroes to Florida, where you may either carry on a plantation, or hire them out to great advantage. I think you need have no fears of the climate, for I have not lost one by bilious disease in the six years they have been there. And now as to your invitation for the summer, the kindness of which we fully appreciate. From your last letters we thought you would not be likely to return here this spring, and I was going to-day to engage a vessel to take our things and servants to Charleston, but Fanny is desirous of spending the summer with you all, and to be near our dear children. I therefore think that we will accept your kind invitation, and that Fanny and her aunt will go on with you all when you return to New York. We suppose that you will come on in April and return in May. I think it desirable that I should visit my plantation this spring, and I shall be obliged to go to Charleston

15

on business. So I think of starting off soon for Charleston, and thence joining you in New York in June or July. You will keep our bedding, etc., for our use, and it would be well for Fanny to send on two or three beds, as I wish to go out from New York to Charleston in the fall.

Tell Mr. Carroll I want him to write soon J. C. Hedenberg, at Newark, and say that I don't want him to send my carriage to the South until he hears from me again on the subject, and as I am not now in haste for it he can have a longer time to finish it.

NEWBERN, March 15, 1837.

Hardy B. Croom to Dr. Torrey, New York:

I have somewhat altered my arrangements for the summer. My family will not go to Charleston until the fall and will spend the hot weather in New York with my wife's mother and sister, and near our children. In the fall we go to Charleston, and take our children with us. In the meantime, however, I shall pay a hasty visit to Florida.

You may expect me in New York early in June, and if I can escape the bad effects of the sudden change in your summer atmosphere, which last year nearly killed me, I hope to be well enough to join you in some of your botanical excursions.

AUGUSTA, March 23, 1857.

Hardy B. Croom to his wife, at Newbern :

I wrote you from Raleigh a few lines, and I write again from this place merely to say that we arrived here safe and well, and after having rested here two days, we are to resume our journey this evening, and four days and nights more will take us to Florida.

I will write you again as soon as I reach the plantation, and let you know how things are going on. Answer this by a letter to Tallahassee, and let me know when you all expect to leave for New York.

TALLAHASSEE, April 3, 1837.

Hardy B. Croom to his wife, at Newbern:

Have your piano boxed and sent to New York and I will exchange it for a new one. The furniture perhaps had better remain as it is, unless you can manage to have it boxed and shipped to New York. The boxes, you know, are already made.

P. S.—We finished raising the frame of our house to-day (thirty-two feet square), so that by next winter I hope to have a comfortable house.

CHARLESTON, April 28, 1837.

Hardy B. Croom to Henry Gaskins, Tallahassee:

I also want you to see Messrs. Hamlins, at Magnolia, and find out what has become of my box of china, which Frank brought from Rocky Comfort, as it has not been sent on. I also miss a box which was sent to them about January last by Messrs. Carroll, Hawkins & Logan. I want both these boxes sent to Charleston by the first opportunity.

NEW YORK, June 9, 1837.

Hardy B. Croom to his brother Bryan, Charleston:

Money very tight, cotton down—advises him to sell his cotton—thinks Mr. Donaldson would accept his draft for a few hundred dollars.

"If you can't sell my horses, nor get them into the country, nor lend them, I wish you would buy a cheap saddle so that Lewis may give them some exercise. I also want him to look occasionally at my carriage and do what may be necessary. If an offer should be made for the carriage, you might take $850 for it, but take care whom you trust."

NEW YORK, June 26, 1837.

Hardy B. Croom to Henry Gaskins, Tallahassee:

" I wrote to you last from Charleston, since which time I have not heard from you."

(Gives directions as to the Plantation.)

"I will get to Florida as soon as I can in the fall, but can't say when that will be. I wish you to carry on the house as well as you can. You can hire Mr. Shine to make the chimney when you are ready, say in August or September—I will have the window sashes made and sent out."

NEW YORK, June 27th, 1837.

Hardy B. Croom to Dr. Bellamy, North Carolina :

(Speaks of the death of his sister, &c., and wishes a brick wall built around the family cemetery.)

" I expect to return to Newbern about the first of October, and thence to Charlerton and Florida as soon as practicable."

NEW YORK, July 25th, 1837.

Hardy B. Croom to Dr. Bellamy, North Carolina :

" I received this morning your letter from Raleigh of the 18th inst., &c. I am glad that you purpose interring my sister and child in the family cemetery. If you wish such a stone as the others there, Mr. Wilcox can order it for you. My health declined after I came here, but I have recruited it by a visit to Saratoga from which place I returned yesterday. I expect to visit Newbern about the 1st October, and to be in Florida about the 1st of December, when I hope to meet you."

NEW YORK, August 14th, 1837.

Hardy B. Croom to Bryan Croom at Charleston :

" As I propose going to Newport to-morrow with my family, to remain a week or two, I write this to go by the vessel which will carry out the boxes containing the portrait and silver articles you ordered. I feel quite languid. I am tired of the city, having no means of recreation or amusement, and no employment except some of a literary sort which I create to keep off ennui. We are glad that you are pleased with Charleston, and above all that you

Smith and Armistead vs. Croom et als.—Statement of Case.

find it healthy. I am desirous to go to Charleston as early as I dare to do so. If neither cholera nor malignant fever makes its appearance there, I wish to go out with my family as early as the 15th or 20th September. You will please keep me advised of the health of Charleston, so that I may be able to judge of the propriety and safety of my doing so."

NEW YORK, September 18, 1837.

Hardy B. Croom to Bryan Croom, Charleston :

" I had the pleasure two days since of receiving your letter of the 8th inst. For the hearty invitation which it contains we all thank you, and we are preparing to avail ourselves of it as speedily as circumstances will allow.— We returned here from Newport about the 1st inst. I have since been making efforts to be ready to leave for Charleston in the boat which is to go on the 28th inst., and there is nothing to prevent my going at that time unless it be the health of Mrs. Camack, she being a member of my family and purposing to accompany us to Charleston. Within a week after we reach Charleston, I shall be ready to go with you to Florida, for I am desirous of seeing what is the state of the crop."

NEW YORK, September 28th, 1837.

Hardy B. Croom to Bryan Croom, Charleston :

" I received your letter of the 21st, this morning. You will, I hope, have received my previous letter in which I informed you of my purpose of leaving this for Charleston as soon as the health of Mrs. Camack would allow. It is now so far restored as to enable her to accompany us, and it is my purpose to go in the boat on this day week, and I know of nothing that will prevent my doing so."

NEW YORK, October 5th, Thursday.

Hardy B. Croom to Bryan Croom, Charleston :

" I write to say that I have taken my passage in the Steamboat Home, which is to go on Saturday the 7th, and

you may expect us in Charleston on Tuesday 10th. If convenient, send your carriage to meet us at the boat when it arrives.

" All the things you requested have been bought."

Dr. Hawkes, a witness for complainants, says : " H. B. Croom did state to me something with regard to his residence, more than once, during his last visit to New York; he spoke to me on the subject of his future plans and purposes, as to residence, particularly; knew that the principal part of his property was in Florida; I also knew he was in the habit of going on there in the winter, leaving his family behind him in North Carolina. He told me that his purpose was to live in the city of Charleston, and to make that his home; that he had selected Charleston because of the literary society it would afford him; that it would be easy, from Charleston, to reach his plantations in Florida, and a much pleasanter residence for the females in his family; that he talked with his brother Bryan Croom, who was in Florida, to adopt the same plan, and live in the city of Charleston; that he was going on when he left New York, with his family, and took his daughter, here, from school for that purpose, to live in Charleston. Mrs. Croom's father was reported to be, and was certainly, a very rich man. I do know that Mrs. C. brought some property, because I heard Mr. Croom speak of the property she brought, but I do not know what it was. Mrs. Croom's health thought bad; never heard of epilepsy; mentally, I discovered no change in conversing with her the summer before she left. She had no attendant at Saratoga, and took her place at the table, as any other lady. Never heard him call Florida his home."

Dr. McLean, a witness for complainants, states that " he must have resided in Florida at the time we had conversations, but I speak doubtfully of that, I cannot say positively. I do not remember hearing him speak of his design

of removing to Charleston.  I understood from some members of the family that it was their intention to reside in Charleston, and that they had taken a house there.  I do not remember hearing Mr. Croom speak of this."

Zaccheus Slade, a witness for complainants, testified that he had frequently heard H. B. Croom call his residence in Newbern his home.

Jane Prentiss, another witness for complainants, testified that she was intimate in the family of H. B. Croom.— Heard Mr. Croom speak about his plantation in Florida; liked the place on account of his making money there, but said he never thought to live there, or move his family there.  Florida, he said, was not a healthy place, and not a good place to bring up a family; told witness that he was going to New York and thence to Charleston with his family, and if he and his family liked it, would live there, if not, would come back.  Never heard Mr. Croom speak of moving to any other place than [Charleston, where he could have his children with him.  Heard Mr. Croom say the night before he left for the North, in the year 1837, that he was going to move from Newbern to Charleston to live; that he was going to spend the summer with Mrs. Croom's mother and sister; that he would take his children from school, and carry them, with the rest of his family, to Charleston.

Henrietta S. Osgood, another witness for complainants, testified that she was intimate with the family of H. B. Croom.  Never heard Mr. Croom speak of moving to Florida; heard him speak of going to Charleston; he was to go to New York and thence to Charleston, to reside permanently, if his wife liked it, if not, was to come back. Heard Mr. Croom and his wife converse on advantages of removing to Charleston.  They said they could educate their children there without being separated from them;

was going to move from Newbern to Charleston to live when he was preparing to leave the last time.

John Burgwyn, a witness for complainants, knew H. B. Croom for fifteen years before his death. Was intimate with him in 1837, and previously he resided with his family in Newbern. He kept house not far from witness. Previous to his going North in the summer of 1837, witness had a conversation with Mr. Croom, at his, witness', house, in Newbern, in which, on witness inquiring of him as to his future movements, he said he had it in view to spend his summer at the North, and, probably, his winter in Charleston. Witness then asked if he meant to make Charlesten his permanent residence ? he replied, he should not during the life of his mother-in-law. Witness met him afterwards in New York, and after a conversation respecting the " Home," witness asked him if they should see him that winter in Newbern. He said, probably not, as his family would probably pass the winter in Charleston. He stated that he himself was going to Florida. Witness frequently conversed with him as to his movements, and he always said that he should not remove permanently from Newbern during his mother-in-law's life.

Thomas Burgwyn, a witness for complainants—Knew H. B. Croom. In 1837 and previously he resided with his family in Newbern. Had heard H. B. Croom say that he considered Newbern as his domicil, and should so consider it until he found some place more healthy and agreeable to himself and family. Also heard him say he believed he would try Charleston during the then ensuing winter. This conversation occurred in the spring or early part of the summer of the year 1837, at the house of witness' father in Newbern.

Mrs. Susan E. Winthrop, another witness for complainants—She is the daughter and only child of Mrs. Armistead, and the grand-daughter and only grand-child of Mrs.

Smith, the complainants. Knew Hardy B. Croom from childhood. Had a conversation with him a few evenings before he embarked from New York for Charleston on board the "Home." He seemed very melancholy and depressed. He said it made him feel very sad at the idea of abandoning his native State, and that he often felt sorry that he had sold his place in Lenoir ; that his plantation in Florida had been very productive, and had increased his income so much that he could now place his family in any situation he pleased ; still it made him feel badly to think of leaving Newbern where he had lived so long. One of the advantages of Charleston was that he could remain there all winter without the necessity of going to Florida more than once or twice during the winter to see how his overseer was managing ; that his daughter and son could enjoy the advantages of education without being separated from him ; that he did not mean to sell his house in Newbern until he saw whether he liked Charleston enough to continue to live there. If he did not he would have his house to come back to. He said he would return to Newbern at Christmas to ship his furniture, and would bring his daughter Henrietta Mary to see our family. Before that time, witness had frequent conversations with him in reference to his interests in Florida. He spoke of Florida as not a proper place for a man to remove his family to. Witness visited the family residence of Hardy B. Croom in Newbern when the bodies of Mrs. Croom and William Henry were brought there. The furniture was pretty much as witness had always seen it. The carpet was on the floor, the chairs sitting round, &c. This was in the parlor. In the bed-room that had been occupied by Mr. and Mrs. Croom, witness saw two beds, but did not observe what other furniture was there. There were boxes nailed up in the house. The house servants were there. For three years before her death Mrs. Croom's health was

16

perfectly good. During that period she had no children. Previously she had been subject to attacks which the Doctors called nervous attacks.

. Mrs. Prudence Rice of Newbern, another witness for complainants, testified that she kept house for H. B. Croom from 1833 to 1836; heard Mr. Croom speak of removing to Charleston in the fall before the marriage of witness, which took place in January, 1836. Saw H. B. Croom for the last time the day before he left for New York in the summer of 1837. He told witness that he had made up his mind to move to Charleston; that he had not sold and would not sell his house in Newbern until he saw how he liked Charleston, and that if he did not like Charleston, he would return to Newbern. Witness was in the house the day after Mr. Croom left; every thing was in its usual or-. der. There was nothing packed except some books and some geological specimens. Mrs. Croom was subject to what the Doctors called nervous attacks. The Doctors said that when she ceased to have children she would have no more of these attacks. Witness does not know of her having any for the last two or three years of her life.

Mrs. Ann Hawkes, a witness for defendants, examined in 1852, states that Wm. Croom, defendant's father, resided in Lenoir. He was a man of large property. He came to Florida, purchased land, and with intent to remove to Florida. Knew H. B. Croom; he lived sometimes in Newbern, and sometimes at his plantation. He derived his support chiefly from his plantation. He paid frequent visits to Newbern, and was induced to live there by the ill-health of his wife, who would not consent to live on his plantation in Lenoir county, on that account. Never offered for the Legislature in Newbern. While in North Carolina, witness' position was not such as to enable her to acquire a knowledge of the intended movements of H. B. Croom and family, but after her removal to Florida her

position was such as to hear from H. B. Croom, on many occasions, his views and intentions. His wife's ill-health prevented his residence on his plantation. Hardy's ill-health was the cause of his coming to Florida. William Henry came out three times. Hardy arranged to bring his daughter. Her mother's ill health prevented. William went to school in Florida; never went to school any place except in Florida, so far as witness knows; two eldest children were at school in New York for the four years previous to his death. The youngest was with the mother. Hardy removed his negroes to Florida, except a few house servants. He afterwards removed his library and a large quantity of furniture, also, his carriage and horses. He had nothing at his death, or previously, in Newbern, any other than town property, and a few negroes belonging to his wife, and furniture left there for the convenience of his wife. He had no relations in Newbern except his wife and children. There were no inducements to continue his residence in Newbern, either on account of advantages of education or health; did not take great deal of interest in the politics of North Carolina; spoke highly of Florida, for planting, for benefit of his health and for botany; thinks he did vote in Florida; he was influenced by his health and the heat of summer, the bracing air of the North, and of travel, to make northern tour. It is the custom for planters, when able, to go North, and Hardy and Bryan, and E. C. Bellamy and wife, for many years did so. The obstacle to prevent Hardy from bringing his family was the extreme ill health of his wife; frequently spoke of Florida as his home, at Bryan's house, in Gadsden. Charleston was frequently spoken of as summer residence, on account of advantages of schools and society, and was tried by way of experiment. Newbern was never named with this view. Bryan rented a house in Charleston for the summer. Hardy also rented one, but gave it

up without occupying it. He broke up his residence in Newbern for the purpose of going to Charleston, but was called off to New York. His arrangements were to take everything to Florida, having prepared wagons to carry out his servants. He was a literary man, fond of botany; never saw him indulge in games; took a good deal of exercise on horseback.

Mrs. Ann Hawkes, examined in 1855, stated that she last saw H. B. Croom in May, '37, in Charleston. He then told witness he had given up his house in Charleston, as he designed to go right on to Newbern, and take his family to New York, and spend the summer, and return to Florida in the fall; that it would be easier to go to Florida from New York than Newbern. The last time witness saw Mr. Hardy Croom she heard him speak of a summer residence for himself and family, and that he said to Bryan that he might stay in Charleston during that summer, and if he did not find it a suitable place for summer residence they could then try others; that Bryan and family spent the summer in Charleston, in 1837; that they did not enjoy good health, and had much sickness; that Bryan stated he was determined to return to Florida in the fall, with his family, and assigned as reasons, that it was a hot, sickly, and expensive place; that he only had considered Charleston as a summer residence, and that he would never return there again for that purpose. Hardy was not present at these conversations of Bryan; this was when Hardy was not in Charleston, but Hardy spoke with his brother as to summer residence, and a removal from Charleston, if it proved unsuitable. The brothers agreed as to their residence for the winter of 1837, and thereafter in Florida, except during the summers. Their reasons were that Florida was their home, and that all their property was here. She has been twenty-seven years in Mr. Croom's family, and has been consulted by him as to his

residence, and has known his views always. She also conversed freely with H. B. Croom on same subject of residence. When Mr. Croom brought out his negroes, he stated he brought them with intention of making Florida his residence, and that he intended to. bring Mrs. Croom out the next fall, with her mother, Mrs. Smith. The year after he moved his negroes he spoke of renting Col. Yonge's house in Gadsden, for himself and family, when they should arrive. That witness has a clear recollection of what passed the year after he removed the negroes, as all felt an interest in immigration, and witness felt it a matter of personal interest to her. Hardy left Florida in latter part of April, 1837; she remembers, because her son Benjamin accompanied him. Witness knew Mrs. H. B. Croom; her health was bad; had epileptic fits;—Hardy said her health was bad, and he could not remove her to Florida on that account, unless he could get some lady who was interested in her to come with her, and spoke of Mrs. Smith having promised to do so, but having disappointed her. Witness never heard Hardy B. Croom and Bryan talk of moving permanently from Florida, [but only temporarily, for the summer. She was present when the brothers arranged for the renting in Charleston. All she heard was as to an arrangement for a summer residence; she heard nothing of an intention to settle permanently in Charleston. He said, about February, 1837, that there was one more visit he would make to North Carolina, and that would be his last; frequently spoke of Florida as his home; that preparations were made at Bryan Croom's to entertain Hardy and his family in Charleston, and so far as she was apprised, they were to reside in Bryan Croom's house until they came to Florida; saw a letter from Hardy to Bryan to such effect. Previous to 1st October Bryan Croom had arranged to go back to Florida, and Mr. Richard Camack was to ship the furniture. B. Croom frequently spoke of his intention to

return to Florida, in the fall, and witness was informed that Hardy was to accompany them. Bryan was not satisfied with Florida as a summer residence, owing to his extreme illness in 1836; witness knows that H. B. Croom was building a very good dwelling house, not merely temporary, and as good as any about the county, and calculated for permanent use. H. B. Croom expressed his determination not to return to North Carolina but once more, and stated that thereafter any one who wished to see him would have to come to Florida to do so.

Wm. S. Blackledge, a witness for defendants, states that Mr. Croom had a conversation with him in Newbern, in 1837, in which Croom declared to him that he had resided in Florida ever since he sold his possessions in Lenoir, and that his visit there at that time was to remove his family to Florida, and would have done so before but Mrs. Croom's health prevented. Said he would not reach Florida till the sickly season was over; that Florida agreed with his constitution, and that he would, as was the custom there, take his family to some more healthy place. Recollection is distinct. After the marriage, their time was divided between Lenoir county, where he claimed residence, and Newbern, where Mrs. Croom's mother lived. Have no knowledge, personally, of Mr. Croom's preparation to remove to Florida. Mr. Croom, before his marriage, spent a part of his time in Newbern, but never claimed citizenship—never voted there. Mr. Croom always claimed to be a citizen of Lenoir, until he sold out and removed to Florida, and then he claimed to be a citizen of Florida.

Thomas Singleton, a witness for defendants, states that a few days before Mr. Croom left, he stated that he did not consider Newbern as his home, any longer. Witness expressed his regret that he was on the eve of his departure from North Carolina; he, Mr. Croom, replied, that he

had removed his property and considered himself not a resident of that State, and it was necessary for him to be a resident of Florida, where his property was. He said he was compelled to go to New York, for his wife's health; knows of no preparation by Croom to remove to Florida. Previous to his removal to Florida, I think Mr. Croom was a resident of Newbern.

Matthias E. Manly, another witness for defendants, stated that Croom was married when he knew him, in 1827; he had a dwelling in Newbern, and a plantation and dwelling in Lenoir. His wife and children spent the greater part of their time in Newbern; he divided his time between the two; this habit was continued till he sold his lands in Lenoir and removed his slaves to Florida. In 1828 he was in Legislature from Lenoir; about that time, and before and after, he served, occasionally, as Justice of the Peace. A residence in the county was required by the laws of the State, to qualify him to act in either of these posts. No personal knowledge of his voting anywhere.

Alexander McConachie, witness for defendants, testified that in 1837, H. B. Croom stated to witness that he was going to Florida with his family, to spend the ensuing winter, at least, there. He talked about it several times, before and at time of his embarkation in the "Home." As I understood him, he intended to settle in Florida with his family, and attend to his plantation, as far as his health would permit. Witness took leave of him on the dock; nothing was said at that time. We had talked weeks before. I understood him, that one reason for going to Florida with his family was to curtail his expenses. Heard nothing said about Charleston.

Thomas Baltzell, a witness for defendants—Knows that H. B. Croom exerted his influence with Dr. Bellamy, (his brother-in-law,) and with others, to remove to Florida.—

Witness was present at frequent conversations between them. Hardy and Bryan were on terms of the most intimate association. They bought lands together in Jackson, Gadsden and Leon, and Hardy stayed at his brother's house almost entirely when in Florida. Hardy brought his son William with him once or twice, who went to school in the neighborhood of Bryan Croom. Mr. Croom contracted for Col. Yonge's piney woods house to reside in, but some circumstance prevented it. On another occasion he wrote to witness to rent his house in Tallahassee. He seemed to think very highly of Florida, as to its prospects for planting, its winter climate and its effects upon his health. He also took a very warm and decided interest in botany, and thought it presented a good field in this respect. He was a retired man, but took a warm interest in the politics of Florida. It was Mr. Croom's habit to make annual visits to the North. The recollection of witness is that almost each successive year, Mr. Croom expressed his design to bring his family, and that the ill health of his wife, and other causes not remembered, were given as the reasons for their not coming. Mr. Croom's interest in Florida was extensive, and he seemed desirous of adding to it each year. His mind was greatly turned to planting. His dwelling-house at the plantation was built for the accommodation of his family. His newspapers were continued at Tallahassee all the time and were taken out by witness in his absence. He, Croom, was desirous for the extinguishment of the Indian war, that he might extend his botanical researches. Another idea was the formation of a Botanic Garden at his place near Tallahassee. Witness and he bought lots together at Apalachicola. From these and other facts witness inferred that Florida was his home. Witness had conversations with Mr. Croom in which both expressed a wish for a summer residence, school and good society, with a convenience to Florida. The health of H.

B. Croom was greatly improved to what it was when he first came to Florida. When witness first knew him, he was quite an invalid—his case seemed hopeless. Each year of his residence seemed to make a change, of which he was aware, and it seemed to attach him to the country.

John M. W. Davidson, another witness for defendants —Had conversations with Hardy B. Croom, (with whom he was on intimate terms,) in which he spoke of Florida as his home, and of his regarding himself as a citizen of said State. He spoke of the improvement of his health and fortune here ; expressed dissatisfaction with Newbern as a place of residence for himself and family, on account of the want of health, society and the absence of all inducement for him to remain. Heard Mr. Croom say he had made permanent arrangements for himself and family at his plantation ; expressed a design of forming a Botanical Garden at his plantation. Mr. Croom's health, when witness last saw him, was better than at the time of his first acquaintance with him.

Robert H. Berry, another witness for defendants—Was intimate with H. B. Croom. Distinctly recollects one conversation with him in which said Croom claimed Florida as his residence. He remarked that he was much pleased with Charleston and contemplated going there to reside for the purpose of educating his children. Hardy B. Croom told him, witness, that he should bring his family out with him in the winter, and it was the same winter of the year that he was lost.

Jacob Eliot, another witness for defendants—Knew H. B. Croom. He was married in Newbern. He lived in Lenoir County until he came to Florida. A part of his time, (directly after his marriage,) he resided in Newbern. He did reside in Lenoir after his marriage, and did represent that County in the Legislature. He stated to witness that his wife would not reside in Lenoir, and that he lived

17

in Newbern merely for her gratification. Does not recollect when H. B. Croom removed his negroes, but thinks it was between 1825 and 1835. He influenced witness in some degree to remove to Florida. He stated to witness that he preferred Florida to Newbern and all other places; that he regarded Florida as his residence and intended to bring his family out with him. Stated distinctly that he was not a citizen of North Carolina, but had always considered himself a citizen of Florida since his removal to Florida. In the year 1836 or 1837, at his residence in Leon County, Florida, he stated he considered Florida as his home and intended to bring his family out in the fall, and hoped witness would make Florida his residence. He spoke of Florida as being very favorable to planting, the winter climate as well suited to one of his constitution and health, and its forests for his favorite study of botany.

Dr. J. T. J. Wilson, another witness for defendants, testified that he heard both Hardy and Bryan express their determination to settle in Charleston and state that they had taken the Poinsett house. Bryan Croom had executed that determination before the death of Hardy. H. B. Croom told witness that his wife and her mother objected to come to Florida. He expressed a desire to reside in Florida, but said that his family objected thereto, but that he hoped in time to remove the objection. H. B. Croom's health was bad when he came to Florida, but in 1837 he had greatly improved.

George Whitfield, another witness for defendants, testified as follows : " I was acquainted with Hardy B. Croom in his life time. My acquaintance with Hardy B. Croom commenced at an early age and continued through his life. He came to Florida about 1829 or 1830.

" In November, 1836, I travelled with him from Camden, in South Carolina, to Florida, in his carriage. I had made no previous arrangement with him. I had gone to

Waynesborough to take the stage, but, the stage being full, returned home, where I learned that Mr. Croom had spent the night previous at my house, &c.  He was travelling in his own carriage, with four horses and two servants.  He said he had made preparations for moving to Florida that fall; that he had bought that carriage and a wagon and four horses, for the purpose of moving.

" He said he was prevented from bringing his family by the sickness of Mrs. Camack.  He said, as I distinctly remember, that he had waited some days in the hope that her health would improve; but finding that her health did not improve, and the weather growing colder every day, he had decided to go to Florida without her.  I was at his house in this State late in the winter of 1836.  I arrived in this State that year.  I was at his house in the winter of that year and also in the succeeding winter.  The house was situated on Lake Lafayette in this county.  The house was never afterwards occupied except by the overseer.— There was a house building at the time of his death on the place.  It was afterwards completed by Bryan Croom, who lived in it for some time.  After Bryan Croom's removal I myself lived in it.

" I was present in Tallahassee when Mr. Croom was negotiating for the renting of a dwelling-house in Tallahassee or its vicinity from Mr. Macoond.  On that occasion, Macoond promised to let Mr. Croom have the house, and was to let him know certainly the next day whether he could have it.  The next day I came in to Tallahassee with Mr. Croom to see Macoond, who then declined to let him have the house.  Mr. Croom seemed disappointed.  This was a treaty for the rental of the house. Mr. Croom wished to have the house, as I understood it, that he might have a residence for his family.  This occurred in November, 1836, I think.

" I know where the Caruthers place was.  It lay about

one mile east of Tallahassee. A tolerably good house was on the place, calculated for the accommodation of a planter's family, according to the then circumstances of Florida.

"I was present at Mr. Croom's house when he received a visit from Dr. Baker in 1836. The question was asked him whether he considered himself a citizen of North Carolina or Florida. He answered distinctly, '*a citizen of Florida.*'

"In my conversations with him, coming from Camden, he left the impression on my mind that he was a citizen of Florida. I don't recollect any of the particulars of the conversation, but recollect that he spoke on the subject, and that I contrasted his situation as a citizen with my own. I think I have heard him speak of having voted here.

"Previous to his coming out here, he had taken some interest and part in the politics of North Carolina. He was not an active politician. He was in the Senate of North Carolina while I was in the lower house in 1828–29.

"I moved a part of my negroes to Florida in 1835, but did not change my own domicil until 1845.

"I don't think he took any great interest in politics in North Carolina, more than any one who had before lived there would. He did not openly participate in the political meetings of his party in that State. I do not know of his ever having voted in North Carolina, after he had moved his negroes to Florida. I was very seldom absent from the elections in the county in which he and I resided, and had regularly voted there. In June, 1845, I removed my family from Florida to Athens, Georgia, where I was offered the privilege of voting but declined to do so. I returned to Florida in the fall of 1845. My family remained in Athens until the fall of 1846. Between 1836 and 1845, I had generally spent my winters in Florida. I had built a

house here before coming, whither I conducted my family on their arrival.

" I remember no particulars of the conversation in which the impression was left on my mind that he was a citizen of Florida.

" Dr. Baker is dead. He was a citizen of North Carolina. He was a considerable planter. I do not think he ever brought his family out. His sons resided here at the time.

" The conversation in which Mr. Croom said he was a citizen of Florida, occurred in 1836. I do not remember who put the question which called for this answer on the part of Mr. Croom, or what led to the conversation.

" Mr. Croom's place did not touch the Caruthers place, except on the corner. There was an intervening eighth. There was a pretty good house on the place. I never was in it, and know nothing of the interior. I do not remember the time this house was applied for.

" I am not *certain* about the year when the application was made to Mr. Macoond. I think it was about 1836. I never saw the house and am not certain whether the house was in town or vicinity.

" Hardy Croom's house was in Leon county; it was a double log-pen. I have no recollection of blankets put to the windows. Sheets were hung around the bed.

" The house which was commenced by Hardy Croom, and finished after his death, was begun, I think, in 1836, after my arrival. It contained, after it was finished, too large rooms below, and two small ones in the attic. It was a one-story house. There were no piazzas to it before his death. There were no chimneys to it, or plastering. It was neatly put up; he had a good carpenter. I do not think it then had window sashes. It was unfinished; nothing but the frame was up. He had no other house in

Florida, to my knowledge. I do not know whether Hardy Croom ever voted in Leon county, Florida.

"Elections were held in North Carolina in August—those in Florida, in May.

"Do not know whether Mr. Croom bought lands in Gadsden, or inherited them. I heard Bryan Croom say that he had bought claims to land in Gadsden from Judge Berrien. Subsequently, Hardy Croom bought claims to land which he never located; afterwards sold to William Croom. Think he owned eighty acres of uncultivated land in Gadsden. Hardy B. Croom worked lands in Gadsden. These lands were on Forbes' Purchase.

"When Mr. Croom and myself arrived here from our trip from Camden, I found no further arrangements about removal.

"Mr. Croom, I think, objected to Newbern on account of the coldness of the climate. He has told me that if he had not spent his winters in Florida, he did not think he would have been living then.

"I remember that he sent a box of china to Florida, and I found him with a pretty fair library here. The china, I think, was shipped from New York. I think the books were brought from Newbern, because they were not new books. It was a general library; the books were of every description, and several hundred in number.

"After having sold his property in Lenoir, I do not think he had any more property there. If he owned any more property in North Carolina, it must have been in Newbern. I think he did own property there, which I was under the impression belonged to his wife.

"None of his immediate kindred remained behind in North Carolina in 1835 and '36, his brother Richard Croom having gone to Alabama in 1835. Alexander, his brother, being a minor, was at school in Hillsboro', in North Carolina.

"I think the family estate in North Carolina had been sold, except the portion which was alloted to Alexander Croom, who was a minor yet, and his portion was afterwards sold by order of the Court.

"I was acquainted with Mrs. Croom, the wife of Hardy B. Croom. I did not see much of her in 1834, '35 and '36, and cannot say what was the state of her health. At the time that I first knew her she appeared to be in pretty good health, though I afterwards heard that she was subject to epileptic fits, and I saw her have one in my house. I have no recollection of having seen Mrs. Croom more than two or three times during the last few years of her life. I do not remember the year in which I saw her have the fit, but it was when her daughter Henrietta was about five or six years old. Mrs. Croom was either going into or coming from the parlor, when she was taken with the fit. Mr. Croom and myself were in the hall in view of the parlor door. We saw her as she was [going into, or coming from, the parlor, when she fell down in the fit. I was very much alarmed, but Mr. Croom did not seem alarmed, and gave as his reason that she was subject to them, and would soon recover, which she did in about ten minutes. Her fit seemed a total deprivation of reason. I think there was some convulsive action. Mr. Croom never afterwards, in conversation with me, alluded to the subject of his wife's health."

*Cross-examination.*—"I know nothing of the title to the house in Newbern, but understood that it was his wife's property. I think I was at his house, probably, in 1835; am not certain about the year I was there; noticed no particular change in the furniture, etc. It was a pretty good house. I do not remember whether it had a good garden attached to it. I think the china was in Florida when I came here. Never saw the china; understood, I think, that it cost $100. I have taken meals with him in New-

bern.   He lived very well; had a good many curiosities, géological, etc.   I think I have heard him say that the books came from North Carolina, though I am not certain.

"I cannot remember the date or the year of the conver-sntion, when he said, that if he had not spent his winters here, he did not think he would have been then living.

"I do not know the number of the lot on which he lived in Newbern.   I do not know whether he attached any great value to any of his property in Newbern.   I do not know whether it brought him any large income.   My im-pression is that it was his wife's.

"I never saw the bill of lading of the china, or a cata-logue of the books.

"I removed the greater number of my negroes to Flo-rida in 1835, reaching here in January, 1836, and except a few house servants, in the fall of 1836 removed the bal-ance, and after that, which was about 1836, I exercised the privilege of a citizen of North Carolina until 1845. The balance of my negroes were brought to Florida in 1836, except my house servants.   I was then a man of family.   Came to Florida with my family in 1845; had purchased lands and made preparations for the reception of my family.   Up to that time I had been a citizen of North Carolina.

"I never heard Hardy Croom speak of buying or exam-ining lands in Alabama, for purpose of settling; never heard him speak of going to Mobile.   I am a relative of Bryan Croom.   I am the son of his mother's sister, which makes us first cousins.

"I think the family of Hardy B. Croom never lived any where but in North Carolina, until their death, in 1837.

"There was a place known as the 'Yonge place,' near Bryan Croom's place, in Gadsden.   There was a dwelling on it, I think.   I remember very little about it."

July 20, 1833, Hardy at Newbern writes to his brother

Bryan in Florida, and says : " I wrote to Richard Carno-chan by last mail to ask him to furnish me with the money I shall want to square off here and take out the negroes I have here." In a P. S. speaks of Dr. Bellamy appearing anxious to move to Florida, and says " the Doctor's bro-ther is now in, and has helped, with my statements, to pro-duce this effect."

The following extracts from the letters referred to were read to shew that Mrs. Croom was in bad health, on which account it is alleged she did not accompany her husband to Florida :

Mrs. Croom, Newbern, to Hardy, Florida, February 9, 1834—She says, " I have scarcely left the house since you left, but expect to-morrow to accompany Ma to Adam's Creek, which will be some recreation for me and what I believe is very necessary for my health."

April 15, 1834, Mrs. Croom to Hardy, Florida, speaks of her delight on receiving a letter from him and says, " No-thing could have been more restoring to my worn out ex-istence while you were absent. My habits always require a constant change or excitement, and when I am left as I have been this winter, I am not surprised when I sink into nonentity. We propose leaving in a few days for Ply-mouth, solely on my own account for refreshment. When we return, we think of going to Adam's Creek, which I hope will relieve that torpitude into which I have fallen, but when you return I hope all clouds will be dispelled."

In the letter of November 4, 1835, from Mrs. Croom, Newbern, to H. B. Croom, Florida, she informs him that she had had another serious attack, the effects of which she had not yet recovered from. And in her letter of 29th December, 1835, to her husband, she says, " If I had been always so situated as to have been actively and profitably employed, my health would have been much better."

18

March 9, 1836, Henrietta Mary, New York, to her father, H. B. Croom, Rocky Comfort—She says in a postscript, " I have just received a letter from mother. She was in a cheerful tone, but I am sure, by something in the style, that she was not well. She mentioned also that grand-ma was sick. How sorry I am that she cannot enjoy better health, and I hope that her health will improve when she changes her place of residence."

Seven instruments of writing were read in which H. B. Croom is described as of Florida. One of them, a bill of sale for a negro man, dated the 24th of October, 1836, was drawn by Mr. Croom in North Carolina, and is from a party who is described as of the town of Newbern.

It appears from a poll-book or list of voters read in evidence, that Hardy B. Croom voted in Gadsden County, Florida, at an election held on the 6th of May, 1833, for Delegate to Congress. It also appears from another poll-book or list of voters, that at an election held on Monday, the 5th day of May, 1834, Hardy B. Croom voted in Gadsden County, Florida, for members of the Legislative Council.

There was read in evidence an entry in the Register of the Marshall House at Philadelphia, purporting to be " Sept. 28th, 1836," in the hand-writing of H. B. Croom, by which he is designated as " H. B. Croom, lady and child, Florida." Also an entry in the same Register, in June, 1837, in the hand-writing of H. B. Croom, by which he is designated as " H. B. Croom and lady and child, and Mrs. Camack, North Carolina."

*Wm. Law, Esq.*, of Savannah, and *James T. Archer*, for Appellants.

*James L. Pettigru, Esq.*, of Charleston, *W. G. M. Davis* and *Long & Galbraith* for Appellees.

DuPont, J., delivered the opinion of the Court:

This cause arose out of the disastrous events connected with the loss of the ill-fated Steamer "Home" on her passage from the city of New York to the city of Charleston, S. C., on the night of the 9th of October, 1837.  Hardy B. Croom and family, consisting of his wife and three children —Henrietta Mary about sixteen, William Henry about thirteen and Justina about seven years of age—were passengers on board the steamer and were amongst those that were lost.  Mrs. Camack a relative, also constituted one of the family upon that occasion.  The bill was filed to determine the succession to such of the estates of Hardy B. Croom as were located in the State of Florida, and upon the hearing before the Chancellor, the bill was decreed to be dismissed.  The Complainants have appealed from that decision and this Court is now called on to determine upon its correctness.

For a full understanding of the claims of the respective parties it is proper to state that the complainant Henrietta Smith, is the mother of the wife of Hardy B. Croom, and consequently the grand-mother of the children through whom she asserts her claim, and that the other complainant, Elizabeth M. Armistead, is the sister of Mrs. Croom and the aunt of the children.  Mrs. Smith is also the administratrix on the estate of the children.  The defendants are the brothers and sisters of H. B. Croom, and Bryan Croom is the administrator on his estate in Florida.

The complainant Henrietta, grounds her claim upon the allegation that the *domicil* of Hardy B. Croom at the time of his decease was in the State of North Carolina —that all of his children survived him and succeed to his estates, and that by the laws of North Carolina, she as the next of kin of Wm. Henry, the last survivor of the children, became the sole distributee of the personal property of Hardy B. Croom, and by the laws of Florida heiress to one moiety of two-thirds of the real estate in Florida, which de-

scended to Wm. Henry, immediately from his two sisters. The complainant Mrs. Armistead asserts a claim to the other moiety of these two-thirds, under the statute of descents of Florida. To the one-third of the real estate, which William Henry inherited *immediately* from his father, they make no claim.

The issues made by the pleadings present two questions of fact, upon the solution of which the claims of the respective parties mainly depend: 1st, whether the father or the children, or either of them was the *last survivor?* 2d, whether North Carolina or Florida was the *domicil* of the father at the date of his decease?

In entering upon the consideration of the first question above indicated, the court is not insensible to the painful anxiety which is always engendered, when the determination of a fact is made to rest in a great measure upon presumption. We do not mean that legal presumption recognized by the civil law, which is founded upon the circumstance of age, sex and physical strength, for it is conceded that the doctrine of the civil law in this respect does not obtain in our jurisprudence, either as a principle of the common law, or as an enactment of the legislative authority. But we mean that presumption arising from the attendant circumstances, which results in producing the conviction in the mind that the fact is as it is alledged. We are also admonished by the very appropriate citations of the counsel for the appellees, that the conclusions of the court must be based upon certainty and not be the offspring of vague conjecture, or the balancing of mere probabilities. We would however remark, that the counsel seem to us to have pressed the doctrine upon this subject, beyond the legitimate bounds prescribed by the authorities cited. We do not understand the books which treat of the rules of evidence, as intending to mean that the certainty must reach that point which would exclude the possibility that the fact be other-

wise ; but only that it should be of such a degree, induced by appropriate evidence as will produce moral conviction. This is the highest degree of certainty which can ever be reached even where resort is had to positive, in contradistinction to circumstantial evidence, for the witness who swears positively and with the most unhesitating confidence may after all mistake as to the fact or he may wilfully perjure himself. That degree of certainty then based upon appropriate evidence, whether positive or circumstantial, which produces moral conviction is all that is required in arriving at a conclusion which involves a question of fact.

The counsel for the appellees very appropriately insist that the burthen of proof as to the survivorship of the children is upon the complainants, and this position is yielded by the counsel on that side. They also hold that if the evidence of the complainants proves the precise time of the son's death, they must also show that the father died before that time ; that this may not be assumed, it must be proved. Both of these positions are undoubtedly correct, but the line of argument used to enforce their application as rules to govern the investigation of the facts of the case, is in our opinion unsupported by reason or authority. As we understood the argument, it was that the same kind and degree of proof was required to prove the precise time at which the father ceased to breathe, as should be used to establish the exact time at which the son died. It so happens in this case that the time of the death of the son is proved by the positive evidence of two witnesses who saw him drown.— The precise time at which the father ceased to breathe depends for its establishment, upon a presumption of fact deduced from the attendant circumstances. Now to say that the conclusion upon the evidence adduced in reference to the latter fact is mere conjecture or surmise, because it should happen to differ in kind or fall in degree below that

adduced in reference to the former, is to destroy all our ideas of the different kinds and degrees of evidence which may be used to elicit truth. Inferences or presumptions of facts are always more or less violent, dependent upon the circumstances which may be detailed by the witnesses. In this very case the *death* of the father as a matter of fact, irrespective of the *time* at which it did occur is wholly dependent upon circumstantial evidence, for no witness testifies that he saw him in that critical moment; and yet that he did perish in that awful catastrophy, is as clearly and as fully proved, as is the death of the son. The citations from the recent case of Underwood vs. Wing, (31 Eng. L. and E. Repts. 297) contained in the brief of the counsel for the appellees, furnish a correct rule for the guidance of the Court, and in our investigations and conclusions we have endeavored to keep within the prescribed limits. The court say " the question of survivorship is the subject of evidence to be produced before the tribunal which is to decide upon it and which is to determine upon it, *as it determines any other question of fact.*" "It is not for the person who claims as next of kin to show that she did not [die first.]— It is not for the person who claims under the disposition to show that probably it might be one way or the other, he must show that that state of circumstances did occur which entitle him according to the language of the will." If we have comprehended the principle to be deduced from these citations, it is that the question of survivorship in the case of a common calamity is a question of fact, involving the simple enquiry as to which of two or more individuals was the longer liver, and that that fact is to be proved as any other question of fact, either by positive or circumstantial evidence, as the exigencies of the case might happen to require. By this rule we have been guided to the conclusion which we have reached.

A further citation from the same case is contained in the

brief, to the doctrine of which we yield our cordial assent. It is as follows: "It is not sufficient to show a variety of circumstances on which it is very difficult to form your mind ; that if you had to lay a wager you would rather lay it one way than the other. The heir at law is not to be dispossessed unless the devisee can show such circumstances as to displace him—not show that there is a confusion as to what happened and that it may have so happened as to entitle him, *but there must be evidence as to who is the survivor.*" While according our sanction to the correctness of these views we are nevertheless unable to perceive the force of the argument which was attempted to be deduced from them as applicable to the case before us. It was insisted upon the authority of this citation that the defendant being the heir at law and *being known to be such,* it would not be permitted to the complainants to oust him of his rights as heir, upon the mere preponderance of probabilities, but that the proof to this point must be such as to produce conviction. In such a case we think the argument would be appropriate, but here the enquiry as to *who* is the heir or next of kin, is the very question to be determined.

The citations from the posthumous work of Mr. Ferne, relied upon by the counsel who concluded the argument for the appellees, only establish the doctrine that as against the next of kin of the father, *legal* presumptions drawn from the circumstance of age, sex and health will not be permitted to prevail ; and from this postulate the argument is attempted to be deduced that in such a case, presumptions of fact arising from mere circumstances, must also be rejected as matters of proof. We have already stated that these legal presumptions which obtain in and are recognized by the civil law, are not sanctioned in our jurisprudence. But while the mere legal presumption is rejected as the basis of a conclusion, yet it not unfrequently happens that the consideration of age, sex, &c., are resorted to in connection

144          S U P R E M E   C O U R T .

Smith and Armistead vs. Croom et al.—Opinion of Court.

with other circumstances *as a matter of evidence,* from which a certain conclusion may be legitimately inferred.— As we understand the doctrine of the common law, it is this, that when several individuals perish by a common calamity and there is no circumstance other than that of age, sex, &c., from which it may be rationally inferred who was the longer liver, in such case, no presumption arises upon which a conclusion can be predicated. But that when the calamity, though common to all, consists of a series of successive events, separated from each other in point of time and character, and each likely to produce death upon the several victims according to the degree of exposure to it, in such a case, the difference of age, sex and health becomes a matter of *evidence* and may be relied upon as such. This distinction is based upon sound reason and is not unsupported by authority. (8 Met. R. 371, Coy et al vs. Leach.)

Another principle of law equally founded upon reason is, that where the evidence has traced the parties into a common danger which proved fatal to both, the last one seen or heard, within the operation of the cause of death, must be adjudged the survivor, unless there be something in the nature of the circumstances to rebut the presumption. (1 Cheves' Eq. R. 108, Pell et al vs. Ball.) The principle is deduced from the doctrine established in the analagous case of a presumption of death from long absence, and we think it may be appropriately adopted as a rule of evidence applicable to the circumstances of this case.

From these preliminary observations, it will be perceived that while we have discarded mere conjecture as a basis of the conclusion at which we have arrived upon the question of survivorship, and rejected the legal presumptions recognized in the civil law, we have nevertheless felt ourselves at liberty to resort to all the circumstances attending that fatal catastrophy; to look to the respective situations of the parties with respect to locality and consequent ex-

posure to danger, and also to their physical strength as imparting more or less ability to combat the impending peril, if per chance from all of these data we might attain to that degree of certainty which would produce upon the mind a *moral conviction* as to the real state of the fact.

The first enquiry then is as to the comparative strength of Hardy B. Croom and that of his wife and children. It is unnecessary to extend this comparison beyond the son William Henry and the daughter Henrietta, for there is no room to doubt that as to the balance of the members of his family, they all perished before him.

There is no controversy respecting the fact that Mr. Croom was a man of delicate constitution, and that his general health was enfeebled by the inroads of a pulmonary affection. This is admitted by the parties on both sides, and it is especially set up by the defendant as one of the controling causes which first operated to induce his alledged removal to Florida. But it is not so much with his general health, as with the state of his physical energies at the moment of the disaster or immediately before, that we have to do. Dr. Hawks says: "I saw him two or three days before he left here on the Home—the state of his health was feeble."

Dr. Torry says: "I considered Mr. Croom a very feeble man, who might be carried off at any moment by a slight increase of his disease. On his last visit to New York he was as feeble as I ever saw him, and on the very morning of his departure in the Home, he called on me, and appeared to be as feeble as I ever saw him. I have made botanical excursions with him, and he always soon became exhausted. From his bodi'y infirmity, I considered him incapable of performing any such service as pumping."

Dr. McLean says: "I have already stated that he was in

19

a state of utter prostration when I saw him last, which was a few days before he embarked—incapable of any physical exertion beyond that of mere locomotion."

Bishop, Quinn, Hussy, Vanderzee, Mrs. Schroder, all testify to his extreme feebleness while on the passage, and down to the time of the disaster. One of these witnesses states that Mr. Croom assisted in handing the empty buckets used in bailing, and that becoming exhausted, he was compelled to desist.

This testimony abundantly establishes the fact that during the time and at the crisis of the disaster, Mr. Croom's physical condition was such as to utterly incapacitate him for the exertion of any physical effort beyond such as might be compassed by the decrepitude of old age or the feebleness of early childhood.

On the contrary, the proof is that his daughter Henrietta Mary, a young lady about sixteen years of age, and his son a lad about thirteen years old, were both possessed of good physical constitution and were capable of exerting as much physical effort and of enduring as much bodily fatigue, as might be expected of persons of their age and sex respectively. We have now in this array of evidence the comparative ability of the father and children for the exertion of that bodily strength and the endurance of that fatigue which the exigencies of the disaster may readily be supposed to have required.

Before proceeding to ascertain the local positions of the respective parties, at and during the crisis of the calamity, it may be proper to define the position of the Steamer, with respect to the adjacent coast. The evidence is that she went on the breakers bow foremost, and afterwards swung around so as to bring the larboard wheelhouse next to the shore—she heading a little to the North.

With respect to the local positions of the several individ-

uals, the evidence is that immediately as the boat grounded, there was a general rush of the passengers from the after cabin to the gangway; that Mr. Croom was amongst those who thus got into the gangway—that he was seen with a lady on either arm—the little daughter Justina in front of the group, and the son William Henry in the rear; that at this moment a breaker swept through the gangway, and when it had passed off, none but the son was seen holding on to the tiller-rope. That one of the ladies mentioned as hanging on the arm of Mr. Croom, was his wife, is established by the concurrent testimony of the witnesses. Who the other lady was is testified to only by Mrs. Schroder—she says that it was Mrs. Camack, the aunt of Mrs. Croom, and a member of the family. One of the witnesses speaks of seeing Mr. Croom standing near the kitchen with his son, after the passage of the first wave. At this time the breakers had demolished the starboard wheel-house and the pannel work inclosing the engine on that side of the boat. While he was standing in this position, another breaker swept the lower deck, and upon the water passing off Mr. Croom was never more seen—the son still retained his position. From this detail of the facts, it is not a violent presumption to conclude that Mr. Croom was swept overboard by this wave. How long in his enfeebled state of health and exhausted energies he could have survived amid the tumult of waters, will be readily conceived by reference to the testimony of Lovegreen, who says that no man, however athletic, could sustain himself more than twenty minutes, unless aided by some part of the wreck to float upon. This we think fixes with unerring certainty the precise period of time at which Mr. Croom perished.—Now let us see how long this was before the son was seen to drown.

Bishop who testifies to the fact of seeing Mr. Croom near

the kitchen door with his son, says that it was after missing Mr. Croom as before stated, that he and the lad stepped upon a portion of the guard of the boat which floated off with them towards the shore, and that the time which elapsed from the parting of the guard, to the time of its grounding, at which time the younger Croom fell off and was drowned, was from a half to three quarters of an hour. Now it being shown that if Mr. Croom, instead of being weak and enfeebled by disease and exhaustion, as he was, had possessed the strength of an athletic and robust man in the full vigor of life, that even with such advantages for sustaining life, he could not survive more than twenty minutes, and that the time which elapsed from the period when the son got on the portion of the wreck upon which he was floated, to the period when he is known to have perished, was from a half to three quarters of an hour, the conclusion is irresistible, that the son must have survived the father. To this strong presumption of fact, is opposed the vague conjecture, that during all this time, Mr. Croom might by possibility have been floating upon some portion of the wreck and thus sustained his life to a period subsequent to the death of his son. The conjecture is within the range of possibility, but it is of too vague a character to combat a rational presumption which has been deduced from known facts.

With respect to the survivorship of the daughter Henrietta Mary, there is not that concurrence of testimony which fixes the survivorship of her brother, but we are nevertheless constrained to the conclusion that she also survived her father, though her death preceded that of her brother's.— It will be noted in this connection that none of the witnesses who speak of seeing the family group in the gangway on the lower deck, make any mention of this young lady, as constituting one of the group. The strong probability is that at the moment that the rush was made by the passengers from

the after cabin, she became separated from her parents, and seeing the impending danger which threatened those who were congregated on the lower deck, she sought safety on the upper deck, and was one of the three or four ladies who are proved to have been on that deck.   Only two of those ladies are identified by name, viz : Mrs. Schroder and Mrs. Hussy ; the names of the others are unknown.  Quinn, however, testifies positively that after he had been driven to the upper deck by the breakers which were continually sweeping the lower deck, Miss Croom and himself sought refuge upon the top of the larboard wheelhouse.   Lovegreen and Vanderzee, both concur, that at this point of time no human being could possibly have survived upon the lower deck—that they must have been either crushed by the falling of the upper deck, or have been swept into the sea.   Here then we have it established beyond all reasonable conjecture to the contrary, that the young lady was alive at a point of time posterior to that at which the father must have perished.   But in addition to and in confirmation of this reasonable presumption is the further fact, attested by the witness Quinn, who says that she remained with him on the wheelhouse for the space of five minutes and until it was also broken up, when she was cast into the sea and was lost.

Upon a full review of all the testimony bearing upon the question of survivorship, we have been irresistably led to the conclusion, that in the common calamity which overtook this highly interesting and respectable family, whose melancholy fate has brought mourning and grief to a large circle of relations and friends, the father perished before either his daughter Henrietta Mary, or his son William Henry, and that of the sister and brother, the latter was the last survivor.

The next subject that claims our attention is that of domcil.   The question presented for our determination is, wheth-

or the domicil of Hardy B. Croom, at the time of his death, was in the State of North Carolina, or in the State of Florida. The evidence abundantly shows—and it is conceded that the former State was his domicil of origin—that he was born, educated, married and resided in that State down to the date of the removal of his slaves to Florida and the establishment of an agricultural interest in this State, which occurred in the year 1831. It is the fact of this establishment of his agricultural interest here, and a divided residence consequent thereon, that has raised the question with respect to his domicil of succession.

The term domicil has a variety of significations dependent upon its various applications. In common parlance, it is often taken to mean simply the house in which a man may have his abode for the time being. Again a man may have a commercial, a political or a forensic domicil, and all of these may exist at one and the same time, and in different localities. Domicil however, in the sense in which we have to deal with the term, has a different signification. It is here to be understood as furnishing the rule by which the succession to personal property is to be governed. In this sense it is termed the "domicil of succession." In the elementary works, as well as in the reports of adjudicated cases, much difficulty has been encountered in circumscribing within the limits of a definition this term, and it has ever been said that it is a term which is not susceptible of a definition. In the correctness of this latter assertion we cannot concur, for it would be a reproach to our language to suppose that its poverty is so extreme that no apt and appropriate words could be found in its extensive vocabulary sufficiently comprehensive to compass the meaning of a legal term of every day use. And it would be a greater libel on the noble science of law to charge it with the use of a term incapable of definition, and consequently unintelligi-

ble to the legal apprehension. The real difficulty encountered by writers upon this subject lies not at all in being able to assign a definite meaning to the term itself but the failure to do so has arisen from the vain attempt to circumscribe within certain prescribed limits, and to enumerate the particular acts which shall be taken to prove the establishment of a domicil of succession. It must readily occur that no compass of language can ever fully comprehend the variety of acts which shall in any given case tend to prove the establishment of a domicil; for these acts will ever be as various as are the occupations of men or the emotions of the mind. When the term domicil is used in this connection, the legal apprehension promptly comprehends its full signification, viz: that it is the actual residence of a man, within some particular jurisdiction, of such a character as shall, in accordance with certain well established principles of public law, give direction to the succession to his personal estate. To determine the character of that residence, certain criteria are to be resorted to ; and it is the attempt to circumsbribe these criteria within definite limits that has given rise to the assertion, so derogatory to the law as a science, that it deals in the use of a term which is incapable of a definition. This vindication of the law we have deemed to be not inappropriate upon the present occasion.

Judge Story classes domicil under three distinct heads, viz: domicil by birth, domicil by choice and domicil by mere operation of law. The first is the common case of the place of birth, *domicilium originis ;* the second is that which is voluntarily acquired by a party, *proprio marte ;* the last is consequential, as that of the wife, arising from marriage. (Story's Con. L. 48-9.) It is with the second of these that we shall principally have to do in the progress of this examination.

The various attempts which have been made to define

this term, amount as before intimated, rather to criteria by
which to guide to a conclusion than to the definition itself,
and thus viewed, they are certainly worthy of all consider-
ation.    Amongst these various attempts to give a fixed
meaning to the word we find the following: Denizart says,
"The domicil of a person is the place where he enjoys his
rights and establishes his abode and makes the seat of his
property."    The Encyclopedists say, "That it is properly
speaking, the place where one has fixed the centre of his
business."    Pothier says that "It is the place where a per-
son has established the principal seat of his residence and
of his business."    Vattel has defined domicil to be "a fixed
residence in any place with an intention of always staying
there.".    Judge Story says, "In a strict and legal sense, that
is properly the domicil of a person where he has his true,
fixed, permanent home and principal establishment, and to
which whenever he is absent, he has the intention of return-
ing, *animus revertendi.*"    (Story's Con. L. 39.)

The definition of domicil according to the Roman law, we
are told by Mr. Phillimore is as follows : "In whatsoever
place an individual has set up his household gods and
made the chief seat of his affairs and interests, from which
without some special avocation, he has no intention of de-
parting ; from which when he has departed, he is consider-
ed to be from home, and to which, when he has returned,
he is considered to have returned home."    The same dis-
tinguished author in his recent treatise on this subject, re-
marks, with marked liberality, as follows : "Perhaps the
American Judges have been the most successful in their
attempts, (at a definition,) and from a combination of their
*dicta* upon different occasions, we may arrive at a tolerably
accurate definition in designating it 'a residence at a partic-
ular place, accompanied with positive or presumptive proof
of an intention to remain there for an unlimited time."—

Domicil he proceeds to say, "answers very much to the common meaning of our word 'home,' and where a person possesses two residences, the phrase, 'he made the latter his home,' would point out that to be his domicil." (Phillimore's Law of Domicil 18. We like this conception of the word *home*, which constitutes the commanding element of the definition given in the Roman law, as well as those given by these two modern jurists. It is the word whose essential meaning comes up fully to our idea of domicil. It is a word which admits not of qualification. To speak of a *permanent* home is to perpetrate a tautology—to speak of a *temporary* home is to involve a contradiction of terms. It is a word which finds its true interpretation in the instincts of our nature. It is a word the full meaning of which is of universal appreciation; it is understood alike by the degraded savage and the classic Greek—by the Republican serf and the refined Roman. Wherever that spot is found there the law fixes the domicil of succession, it matters not whether that be upon the wasted hills of the "North State" or on the virgin plains of the "Land of Flowers."— The determination of that locality is the subject of evidence, and that evidence must establish two points—first an actual residence, and secondly the deliberate intention to make it his *home*, in the acceptation in which it is used in the foregoing citations. Ordinarily the proof of the first point can never present any very serious difficulty. Not so however with respect to the second. The establishment of the purpose or intent will usually depend on a variety of acts or declarations, all of which must be weighed as we would weigh evidence upon any other subject. These constitute the *criteria* of intention, and are more or less conclusive according to their character as we shall perceive by reference to the doctrines and rules hereinafter adverted to.

20

For the purpose of avoiding confusion, and in order to be able to estimate the value of the numerous adjudicated cases which were cited to the court as authority upon this subject, it will not be inappropriate to advert briefly to the extent and origin of the law which, as an incident of domicil, gives direction to the succession to personal property. Upon enquiry we shall find this doctrine of the law is of almost universal acceptance amongst the nations of the civilized world, and that it owes its paternity to the exigencies of international intercourse and is sanctioned by that comity which is known as the foundation of the *jus gentium*. It is very true that every independent sovreignty has the right by local legislation, to withdraw from the operation of this doctrine, the property that may chance to be found within its territorial jurisdiction. But the experience of mankind has demonstrated its wisdom, and it is quite questionable whether any one State could so legislate without bringing herself into direct hostile collision with other nations. This subject is ably treated of by Chancellor Kent in the 2nd volume of his Commentaries at page 344, and his work may be consulted with profit.

Before proceeding to the examination of the evidence in this case, it may serve a useful purpose to lay down a few simple rules of easy application. The first principle to which we refer is, that the domicil of origin once ascertained will attach until a new domicil is established *facto et animo.* Monroe vs. Munroe, 7 Clarke's and Finnelly's Repts. 842 ; Phill. on Domicil, 75.

2nd. The mere intention to acquire a new domicil without the fact of an actual removal avails nothing ; neither does the fact of removal without the intention. Story's Con. L., 46.

In entering upon the examination of the evidence touching the question whether Mr. Croom's domicil of succession

was in Florida or in North Carolina at the time of his death, we have classified it into *acts* and *declarations*, and shall proceed in our investigations in that order.

FIRST HIS ACTS :

There is no controversy about the fact that Mr. Croom did actually make large purchases of land in Florida prior to the year 1834, first in the counties of Gadsden and Jackson and subsequently in the county of Leon ; that these lands were purchased expressly for agricultural purposes and not for speculation ; that they were actually settled and improved by Mr. Croom, and that he removed all of his slaves with the exception of a few house servants, from North Carolina to Florida and settled them upon these lands; that his principle agricultural establishment and the bulk of his fortune was in Florida ; that he annually visited his plantations in person, and during those visits spent a large portion of each year in Florida, sometimes residing in the family of his brother Bryan Croom, and after the settlement of his plantation in Leon county, occupying a house on his premises, where he received company and extended the rights of hospitality to his friends. The evidence shows we think, that after the settlement of his plantation in Leon county, he might be considered a *resident* or *inhabitant* of that county, in the common acceptation of those terms. These are all *indicia* tending to the establishment of his domicil of succession. Here was an actual *residence* and *inhabitancy* established, with the bulk of his fortune drawn around him, and the centre of his business fixed.

To these *indicia* are opposed the fact that his original domicil in North Carolina had not been abandoned *de facto* ; that his family mansion had not been disposed of, nor had it been dismantled but that it still continued to be the actual *residence* or *habitation* of his wife and children—the household furniture and decorations remaining the same, as also the accustomed retinue of servants.

Here we have in opposing array the acts which go to establish the matter of *fact,* and to determine the preponderance it becomes necessary to advert to a few plain rules of law as we find them enunciated in the books: 1st. The original domicil is not gone until a new one has been actually acquired, *facto et animo.* 2nd. The place where a married man's family resides is generally to be deemed his domicil; but the presumption from this circumstance may be controlled by other circumstances. 3rd. The house of trade or centre of a man's business in connection with actual residence, raises a strong presumption going to fix a man's domicil of succession, and may be taken to be conclusive upon his commercial domicil. But in determining a domicil of the former character, when the house of trade and centre of business is opposed by the locality of the wife and family, that locality is deemed the better criterion of domicil. Phill. Law of Dom., 82 *et passim.* Story's Con. L., 45 *et passim.*

On the one hand we have the actual residence of Mr. Croom in Florida—on the other we have the equally well established fact that he had not *de facto* abandoned his residence in North Carolina, but that he continued to spend a portion of each year down to the time of his death with his family at their original place of abode. On the one hand we have the strong circumstance that the centre of Mr. Croom's business and the bulk of his fortune was in Florida. To this is opposed the fact that the locality of his wife and children was in North Carolina, and the weight of that circumstance is greatly increased by the fact that they occupied the original family mansion by his authority and approbation. To account for the want of an abandonment *de facto* of the family mansion in North Carolina the defendants insist that it was occasioned by the state of Mrs. Croom's health. Without undertaking to settle the ques-

tion of health, which was mooted and so vigorously contested on either side, we think that if the fact be as was insisted by the counsel for the defendants, it becomes a most pregnant circumstance, as a matter of evidence upon the question of intention.  Can it be presumed that a gentleman of Mr. Croom's high social position—a gentleman of education and intellectual refinement—one who exhibits as he does in his voluminous correspondence with his family, so much of the tender husband—the affectionate father— that he, influenced by a sordid appetite for wealth—the desire to find a field of operation which might give a wider scope to the pursuits of his favorite science or even with a view to the restoration of his own health—that he under the operation of these combined influences could ever for a moment, at any time after the first removal of his slaves to Florida have entertained a *present* intention to desert that afflicted wife who so much needed his sympathy and support.  Such a presumption would be a libel on the unconscious dead, and we are well assured would be scouted with merited indignation by the intelligent and worthy counsel who represent the defendants; and yet to our minds the premises being assumed, the presumption is legitimate.— For without a *present* intention to abandon the domicil of origin at all hazards and without any qualification, the fixing of his partial residence in Florida and the occupancy of a house on his plantation during a portion of the year, although these acts might, under the operation of local laws, be sufficient to constitute him a resident or inhabitant, yet under that law which pervades the jurisprudence of the civilized world and finds its only sanction in the comity of nations, they are impotent to establish the domicil of succession.  As we understand the doctrine of the books, it is not the present intention to acquire a domicil *in futuro*, that they recognize as an element of the domicil of succession ;

but it must be a present intention to acquire it *in presenti.* And hence the admitted doctrine that where a party abandons the domicil of origin *in fact,* and with a *present intention* to acquire a new one, if he dies *in itineræ* and before he has consummated that intention by an actual residence, the domicil of origin *ipso facto* and *eo instanti* reverts and re-attaches to the party. We therefore conclude that these acts of purchasing lands, settling plantations and residing portions of the year in Florida, do not of themselves indica'e such a present intention as would warrant us in declaring that Mr. Croom had abandoned his domicil of origin in North Carolina.

The next prominent act of Mr. Croom which claims our attention, is that of the exercise of the political right of voting at a public election in the territory of *Florida,* coupled with the negative act of ceasing to exercise that right in North Carolina after the date of the first removal of his property to the said territory. While the evidence fully establishes this state of case, we nevertheless think that undue importance is given to these acts, and that they do not indicate any intention either to abandon the domicil of origin or to acquire a domicil of choice. In using the term domicil in this connection we intend to be understood as meaning the domicil of succession, as contradistinguished from the other kinds of domicil—such as political, commercial and forensic. This distinction ought always to be kept prominently in view whenever we attempt to investigate the subject, and it is for the want of a proper observance of it that so much confusion and contradiction has crept into the opinions accompanying the adjudicated cases. In many of these opinions there is an utter confounding of the terms residence, habitation and domicil as they are found in the *local* statutes of different States, with that domicil of succession which has its only sanction in the *general*

law which has obtained as a rule of action throughout the civilized world. This confounding of terms is the prolific source of those numerous *dicta* which serve only to bewilder the honest enquirer after truth. To our minds nothing can be more illogical or less likely to elicit truth than the attempt to apply the legal principles governing the one class of domicil to that of the other. Without dilating further upon the subject, it may suffice to show that we are fully sustained in these views by authority of the highest character.

Phillimore in his recent treatise on the law of domicil, at page 88, et seq., has collated the authorities upon this particular point. He informs us that the possession and exercise of political rights and the payment of taxes have been considered as strong tests of domicil by the Roman law and by the civilians, but that they have had perhaps less weight given them in England than in continental Europe.

In the case of DeBonneval vs. DeBonneval the court observed—"I am inclined also to pay very little attention to the statement as to his exercise of political right in France or his being registered as a voter here; being a house-keeper he was registered here as a matter of course."

In the case of the ship "Ann" the question was whether, from the residence and employment of the owner and master, he was *quoad* the vessel to be consided a British subject. Sir W. Scott in pronouncing judgment observed: "The question therefore comes to this, whether the claimant is *quoad* this property, to be considered as a British subject. For some purposes he is undoubtedly so to be considered. He is born in this country and is subject to all the obligations imposed upon him by his nativity. He cannot shake off his allegiance to his native country or divest himself altogether of his British character, by a voluntary transfer of himself to another country. For the mere purposes of trade

he may indeed transfer himself to another State and may acquire a new natitional character." * * "Now the account which he gives of himself is that he was born at Falkirk in Scotland—that during the last seven years he has been chiefly at sea, but when at home he has lived and still lives at Bathgate, in the shire of Linlithgow, in North Britain—that he is a subject of our sovreign Lord the King, but about sixteen years ago he was admitted a citizen of the United States of America for the purpose of commerce only. Why this transaction is for the purpose of commerce ! According to his own account then, he ceased to be a British subject for commercial purposes." (Cited in Phill. on Dom., 90.)

This case bears with peculiar weight upon the distinction which we have taken between the different kinds of domicil, for while it is strenuously maintained agreeably with the English doctrine upon the subject, that a British subject cannot voluntarily throw off his national allegiance, yet it is ruled that *for the purpose of commerce* he may cease to be a British subject.

The same distinction is recognized in our courts. In the case of Guier vs. O'Daniel, (1 Binn. R. 364,) Rush, Pres. said—" It is I think extremely doubtful whether voting and paying taxes, are in any way necessary to constitute a domicil, *which being a question of general law cannot depend on the municipal regulations of any State or nation.*" The citation of authority on this point might be indefinitely extended, but this will suffice to show that upon the question of a *domicil of succession*, the act of voting if at all admissible as a criterion of intention, is at best of a very dubious character, and entitled to very little weight.

Having thus examined the various criteria of intention as classed under the head of acts, we now proceed to consider those coming under the head of Declarations.

*1st. Oral Declarations :*—We have scrutinized with much care the testimony of the numerous witnesses who have spoken with respect to the oral declarations of Mr. Croom concerning the place of his domicil, and the result of our investigation is, that the evidence thus deduced is so vague in point of date and expression, and so very *contradictory* in terms, that we are constrained to reject it entirely from the consideration of the cause. This vagueness and con-tradiction could be glaringly exhibited had we the time and space to refer to the depositions of the respective witness-es in detail, and would fully justifiy the assertion to be met with in the books, that " of all kinds of evidence it is the most unreliable." 1 Stark. on Ev. 460. Phill. on Dom. 77.

*2nd. Written Declarations :*—Under this head may very appropriately be considered the entries in the register of the " Marshal House," a hotel located in the city of Phila-delphia. There are two entries made in the hand writing of Mr. Croom, at two different dates, the former describing himself as of Florida, the latter as of North Carolina.— Were there not this palpable *contradiction* in the two en-tries, they could have but very little weight in determining the question of domicil, when it is recollected that [Mr. Croom had a divided residence, and he might well have described himself as of either place.

Under the same head may be considered the description which Mr. Croom gave himself in certain bills of sale, ex-ecuted between the date of the removal of his slaves to Florida, and the date of his decease. In these he is de-scribed as of the State of Florida. The authorities are somewhat conflicting as to the weight to be given to de-scriptions in legal documents; but the better opinion seems to be that the weight due to this species of evidence must very much depend upon the particular circumstances of each case, and that it would rarely be safe to discard al-together the consideration of it. Phill. on Dom., 87-8.

21

A circumstance connected with the execution of one of these bills of sale, was strenuously pressed in the argument, as entitling it to great weight; that circumstance was the fact, that *it was executed in North Carolina.* Ordinarily, the presumption of an executed intention to fix the domicil of succession, arising from such a circumstance, would be very strong; but in this case, and with respect to this particular document, it is encountered by this controlling fact, that whatever may have been his intention prior to the date of that instrument, it is not pretended to be controverted, that, at that particular period of time, he had given over any intention to make Florida the seat of his family establishment. As bearing upon this point, amongst others, we are not insensible to the position assumed by the counsel for the defendants, viz: "That the issue being as to whether H. B. Croom did, or did not, acquire a domicil in Florida in the year 1832 or 1833, the evidence must be confined to the period of time indicated." If the premiss assumed in this proposition be granted, then the conclusion is undoubtedly correct, and the argument deduced from it would apply with force, not only to the point now particularly under consideration, but to others to which it was sought to apply it. But we do not agree that the *issue* is as stated in the proposition. The chief obstacle which the defendants have had to encounter, in order to make good their defence, and thereby defeat the claim of the plaintiffs, is the fact of the non-abandonment, *de facto,* of the domicil of origin. The evidence shows that this non-abandonment continued down to the very period of Mr. Croom's death. Under these circumstances we think that the true issue is, not whether a domicil of choice had been acquired at any particular period of time, but whether at any time, from the date when he first purchased land in Florida and removed his slaves there, down to the date of his decease, he had so acquired

a domicil in that State.  If we be correct in this, then it is manifest, upon every principle of sound reason, that the evidence bearing upon the question of intention, through- out that entire period of time, must all be resorted to, and that each particular circumstance occurring within those limits, becomes a part of the *res gestæ.*

Under the head of written declarations, we now approach the portion of the evidence which is contained in the very voluminous correspondence, consisting of letters written by and to Mr. Croom, during a period immediately ante- rior to the date of his first visit to Florida, down to the date of his departure from New York on board the ill-fated "Home."  From a careful examination of this corres- pondence, aided as we have been by the abstracts kindly furnished us by the counsel on both sides, we have been irresistibly driven to a conclusion respecting Mr. Croom's intentions, throughout the entire period of that correspond- ence, which leaves not a lingering doubt upon our minds. No impartial mind can fail to arrive at the conclusion that, in the first visit of Mr. Croom to Florida, stimulated by the prospect of health, wealth, and the pursuit of a favor- ite science, he did entertain a *present* purpose and a *pres- ent* intention to make his *future* home and that of his family in that State.  But the conclusion will be equally irresistible that this purpose and intention remained but for a brief space of time, and certainly was abandoned be- fore he had fitted up, or even procured a house for the ac- commodation of his family.  This vacillation of purpose is the *marked characteristic* of the entire correspondence; and to show what little reliance ought to be placed upon his declarations in the earlier portion of the correspondence, connected with the removal of his slaves to Florida, it is only necessary to refer to that correspondence.  It will be remembered that the removal of the slaves to Florida was in the fall of 1831, and we find that as early as the 13th of

May of the next year, in a letter of that date, he intimates a desire to transfer a portion of his planting interest in Florida to another State. In the letter of that date to his brother, Mr. Bryan Croom, he says : "If our place on the Apalachicola could be sold at a fair price, I would be willing to transfer a part of our negroes to this State."

To show that the defendant, Bryan Croom, himself did not consider that his brother had designed, by the act of removing his slaves, to establish his residence in Florida, we refer to his letter of the 14th of August, 1832, in which this passage occurs : " *Write me when you will probably come to Florida, and I would impress you with thinking seriously of moving to it.*" Now if the defendant, when he wrote this letter, had deemed that the removal of his negroes to Florida had been made with the intention of making that State the residence of himself and family, why this solicitation?

On the 17th August, 1832, H. B. Croom writes to his brother Bryan—"*I expect to go to Florida with Mrs. Smith,*" (his wife's mother.) " *If she does not like it we will look at Alabama.*"

On the 6th of October, 1832, he again writes to his brother—"*I am very anxious to be with you, and am resolved to remain* 12 *or* 18 *months at least. Next May I think of looking at Alabama, and perhaps you will accompany me.*"

Now, in the face of these written declarations, will it be seriously insisted that at this date, (Oct. 6th, 1832,) Mr. Croom entertained that fixed intention of remaining permanently in Florida, which the law requires to establish the *domicil of succession?* But the argument is, that at a later date, to-wit: in May, 1833, his domicil was established by the act of *voting* for Delegate to Congress. Now when it is remembered that his presence in Florida at the time of the election in 1833, was in accordance with the

contemplated visit referred to in the letter of the 6th of October, we submit to any candid legal mind what value can be attached to this act of voting.

But how was it in 1834, when he again voted for members to the Legislative Council? Did this act fix his domicil then? To determine that point, it is only necessary to refer to the letter of his wife, addressed to him under date of the 9th of February, 1834. In that letter she says— " Mr. B. recommends Mobile. Suppose, *before you settle permanently*, you give yourself time to judge." From this remark it is quite evident, that at this date, his wife did not consider him *permanently* settled in Florida ; and of all persons she most assuredly ought to be deemed to have best known his mind on the subject—a subject which was so intimately connected with her comfort and happiness.

Here we might with propriety close our reference to the evidence disclosed in the correspondence, inasmuch as it seems to have been conceded by the position assumed in the argument, and which we have before noticed, that unless the domicil of succession was established in the years 1833 and 1834, it never was established after that date.— But as we have before expressed the opinion that every part of the evidence, covering the whole time that elapsed between the first removal of the slaves to Florida, down to the period of his death, was to be taken to form a part of the *res gestœ*, we will proceed briefly to refer to such of the later letters as may serve to throw any light upon the subject.

On the 6th of October, 1835, Mr. Croom writes from his home in Newbern, N. C., to Dr. Torrey of New York, " I am about to leave on my *annual peregrinations* South." Who can mistake the import of this language? Would a man of Mr. Croom's education speak of "*peregrinating*" his home—his fixed place of residence—his domicil of

succession ? In marked contrast with this language, is that which pervades and runs through the whole correspondence whenever a visit to Newbern is mentioned. Then the language is, " I am anxious to *return home*," and with the word *home* is frequently coupled the endearing associations of " *wife, children and friends.*"

On the 8th November, 1835, he writes to his wife from Florida, " It is a good country for planting and merchandize, but I cannot say it is a desirable country to live in ; indeed, I have pretty well concluded *not to settle here*, but to make all the money I can, and *lay out none of it in building.*"

On the 17th October, 1836, he writes to Dr. Torrey, of New York, from Newbern—" I am about to break up my establishment here and transfer my family further South. *I do not propose to settle them in Florida, but probably in Charleston, where I can more easily visit my plantations in winter*, and where I shall enjoy a more cultivated society, and greater literary means than I can elsewhere find at the South."

On the 7th of February, 1837, he writes to Dr. Torrey, informing him that he had obtained Mr. Poinsett's late residence in Charleston.

We have thus collated and considered the various circumstances relied upon for the defendants as *criteria* by which to determine the domicil of Hardy B. Croom. These have been encountered, on the part of the complainants, by the overwhelming presumption arising from the pregnant circumstance of the non-abandonment *de facto* of his domicil of origin, and the continued residence of his family there, surrounded by the entire *domestica instrumenta* of a gentleman's establishment ; and whether we adopt the one or the other of the numerous definitions assigned to the term, we are constrained to decide that his domicil of

succession, at the time of his death, was located in the State of North Carolina, and not in the State of Florida.

We now proceed to the consideration of the third point made in the argument, and which involves the interpretation and construction to be given to the 10th clause of the act regulating Descents, approved 17th November, 1829. The necessity for this adjudication arises from the conclusions at which we have arrived upon the question of survivorship. The conclusions upon that point are, that Henrietta Mary and William Henry both survived their father, Hardy B. Croom, and that of the two children William Henry was the survivor. It will be noted that the two children were minors at the time that they perished, and that both of them died without issue. The question for our adjudication is, which, in the contemplation of this clause of the statute, was intended—an *immediate* or a *mediate* descent from the father? The clause is in the following words :—" That whenever an infant shall die without issue, having title to any real estate of inheritance derived by gift, devise or descent from the father, and there be living at the death of such infant his father, or any brother or sister of such infant on the part of the father, or the paternal grandfather or grandmother of the infant, or any brother or sister of the father, or any descendant of any of them, then such estate shall descend and pass to the paternal kindred, without regard to the mother or other maternal kindred of such infant, in the same manner as if there had been no such mother or other maternal kindred living at the death of the infant, saving," &c.

It is contended by the complainants that the 10th clause of the act of 1829, regulating descents, must be limited and confined in its application to cases of *immediate* descent from the father; while, upon the other hand, it is contended by the defendants, that it is sufficient to show that the estate was derived *mediately*, or through an intermediate

descent from the father, in order to let into the inheritance the *paternal* to the exclusion of the *maternal* kindred.

It may be well, in the very beginning of this examination, and before particular reference shall be had to reported cases, to state some of the general and elementary principles which have long been received and sanctioned as sound and safe rules to be observed in the interpretation and construction of statutes ; for if the application of these rules to the statute now under consideration shall lead us to an interpretation of its meaning which shall be *in itself* satisfactory, and we should further find such interpretation fully and strongly supported by the authority of well considered and adjudicated cases, we shall have arrived at a conclusion under circumstances which càn leave but little room for the apprehension of error or the anxieties of doubt.

The first of these general rules which we lay down is—

1. That in the exposition of a statute, the leading clue to the construction to be made is the *intention of the Legislature.* This intention may be discovered from different signs. Dwarris on Statutes, top p. 42.

2. As a *primary rule*, the intention of the Legislature *is to be collected from the words*, and it is only where the words are not explicit, that we will be permitted to gather the intention from the occasion and necessity of the law, as the causes which moved the Legislature to enact it. Dwarris on Statutes, 42.

3. The words of a statute are to be taken in their ordinary and familiar signification and import, and regard is to be had to their general and popular use. And, indeed, so much deference has been paid to this rule, that it hath been declared, that although it may have been the usage to construe the words of a statute contrary to their obvious meaning by the vulgar tongue, and the common acceptation of terms, such usage is not to be regarded, it

being rather, say the books, an oppression of those con-
cerned than a construction of the statute.  Dwarris on
Statutes, 47, and note (x.)

We will now set out "in *hæc verba*," the language con-
tained in the tenth clause of the act of 1829, which this
Court is called on to construe. They are as follows:
"*Whenever an infant shall die without issue, having title
to any real estate of inheritance, derived by gift, devise
or descent from the father*," etc.

Now the question is, what was the intention and mean-
ing of the Legislature, in the employment of the above lan-
guage, "*gift, devise or descent from the father.*"

It has been seen, from a rule above laid down, that the
proper course, in all cases where the intention of the Le-
gislature is brought in question, is to adhere to the words
of the statute, construing them according to their nature
and import.   Now, if in the application of this rule, it shall
be found that the words used in the Act, and now requiring
construction, are of a *plain and definite import*, then we
are bound to understand and construe them according to
such import, and we cannot be allowed to enter into any
speculations or conjectures as to the *supposed* intention
of the Legislature who framed the act.  For in the first
application of the rule, the Courts, it has been said, will
not be allowed to *presume* the intention of the Legisla-
ture, but will be required to collect such intention from
the words of the act.   See Dwarris on Statutes, 48.

While the words of a statute are to be adhered to, and
they construed according to their nature and import,
it would be unsafe to disregard the order in which they
stand in the Act, their connection with each other, and
their common reference, (if the fact be so,) to the same
subject matter.

"*Gift, devise, or descent from the father.*"  It is not
difficult to determine, from the reading of the clause of the

22

statute, of which the above quoted words form a part, that it was the intention of the Legislature to preserve to the paternal kindred the inheritance of real estate, of which an infant died siezed, leaving no issue, and which the infant had derived from the father, in the manner pointed out in the statute. The Legislature did not simply provide, in the enactment under consideration, that real estate derived from the father by an infant who died siezed without issue, should go to the paternal kindred in exclusion of the maternal kindred; but it undertook to point out and declare, and did, as we think, in clear and definite terms, designate the *particular modes* by which such estate should be derived from the father, so as to preserve the inheritance to the paternal blood. "Derived by *gift, devise, or descent from the father.*" Interpreting these words according to their plain signification and import, it is impossible to conclude, that, in the case of a "*gift,*" within the operation of the Act, the Legislature could mean any other than *immediate gift from the father.* To say that a gift in this case by Hardy B. Croom, in his life time, to Henrietta, his daughter, and a gift of the same estate in her life-time, by Henrietta to William Henry, would be a gift from the father, Hardy B. Croom, to William Henry, within the meaning of the statute, so as that William Henry, dying without issue, and a minor, the inheritance would descend to the paternal blood, would be a proposition so utterly opposed to the clear and explicit import of the words of the act as not to bear examination, or survive the test of the well known and established rules of construction. It would not do to say, that a gift from Hardy B., the father, to Henrietta, the daughter, and the donation of the same subject matter of gift by Henrietta to William Henry, her brother, would be, in any view which can reasonably be taken of the question, a gift from Hardy B. to the latter. So it would be in the case of a devise

from one to another. It is, "*ex rei necessitate*," an *imme-diate* transmission of an estate by last will and testament; so that if Blackacre be devised by A. to his son B. and A. dies, and B. devises Blackacre to his brother C. and dies, the estate, upon the plain and obvious import of the language of our statute, cannot be said to be derived by devise by C. from his father, A., so as to commit it to the course of descent, which, in the event C. died an infant, without issue, would secure the inheritance to the paternal blood in exclusion of the maternal kindred. This is too plain to admit of argument, and we might consider it unnecessary to give any reason for our conclusion upon this point, "*dehors*" the plain, clear, definite and unequivocal import and signification of the words employed—*gift*, or *devise from the father*.

But it is contended, that in the construction of the words "*gift, devise, or descent from the father*," the word "*descent*" is not to be limited and confined to the case of an *immediate* descent from the father, notwithstanding the words "*gift*" and "*devise*" are, by their plain and necessary import, confined and limited to cases of *immediate* gift, and *immediate* devise from the father to the child. This distinction, we suppose, is mainly based upon the idea, that a *gift* or *devise* must always, and necessarily be, *by the act of the parties*, while *descent is by operation of law*. Yet we cannot see how this can enable us to escape from that imperative rule of construction which compels us to interpret the words of a statute, *when plain and explicit*, according to their natural and obvious import. What is the natural and obvious import of the words, "descent from the father?" Under this rule of interpretation, they cannot be taken to mean a *descent from the sister;* for the words "*descent from the father*," naturally and obviously import an *immediate* transmission of

an inheritance *from the father*, and therefore *necessarily exclude the idea of intermediate descents*.

If Henrietta Mary survived her father, Hardy B. Croom, then that portion of his estate which descended to her became vested in her by an absolute fee simple title, so that if she had labored under no *personal* disability, such as infancy, etc., she could have disposed of the same by gift or devise, or any of the various modes of transfer and alienation which are the necessary legal incidents to an absolute dominion over property.

Being thus invested with an absolute title to the estate which she inherited from her father, she became and was legally constituted a *new substantive* and independent source of inheritance, to which, upon her death, the descent must be traced. And, accordingly, upon her death, the estate descended from her to William Henry, who survived her; and still keeping in view the rule which requires the interpretation of the words of a statute in their most *common acceptation* and *obvious import*, we are compelled to say, that, in the meaning of the statute, the descent was from Henrietta to William, and not from Hardy B. Croom, the father, to the latter.

That the Legislature, in the tenth clause of the Act of 1829, did not intend to embrace within its provisions *mediate* descents, or such descents as have come to the infant last seized through the devolution of intermediate descents from the father, we think may, independent of the natural and obvious import of the words of the statute, be most strongly inferred from the order in which the words "*gift, devise and descent*," stand in the statute, their close connection with each other, their common and simultaneous reference to the same subject matter, and the clear and unembarrassed philological construction of the clause of the statute in which they are employed. We therefore come to the conclusion, that by a true interpre-

tation of the tenth clause of the Act of 1829, the Legislature, in the employment of the words "*gift, devise and descent from the father*," meant and designed an *immediate* descent from the father, just as they must and did mean an *immediate* gift, and an *immediate* devise, from the father.

Having thus considered of this question in the light of the known and established rules governing the construction of statutes, and which are above set out, we will now proceed briefly to refer to and bring forward some of the adjudicated cases which bear upon the question now under the coneration of the Court, and see whether the interpretation which we have given to the words "*gift, devise and descent from the father*," is sufficiently supported by the authority of such cases.

In the case of Duncan vs. Lafferty's Adm'rs., &c., reported in 6 J. J. Marshall, 46, the Court was called upon to construe the 6th section of the Act of the Legislature of Kentucky of 1796, which section provided that " where an infant dies without issue, having title to any real estate of inheritance, derived by purchase or descent from the mother, neither the father of such infant, nor any issue which he may have by any person other than the mother of such infant, shall succeed to or enjoy the same," &c.

The facts in this case were as follows : Abijah Brooks died leaving a tract of land, part of which descended to his grandson, Abijah Duncan, whose mother was a daughter of Brooks and wife of the plaintiff in error; but she died before her father, and consequently the estate was cast upon her son, by descent, directly from the grandfather.— Abijah Duncan died when a minor, leaving neither wife nor child. The question presented to the Court was whether, under the 6th section of the Act of 1796, the estate of the deceased infant would pass to the maternal kindred, and the Court decided, that in order to let

in the maternal kindred in exclusion of the father of the deceased infant, the estate must have come from the *mother herself*. The Court, in delivering their opinion, say, that it would require great latitude of construction to make the term *mother* include *grandfather;* and so in this case, we are of the opinion that it would require as a great latitude of construction to make the term *father* include *sister;* for, as said by the Court in the case cited, the term *father* might with equal propriety be made to include *uncles, aunts and cousins.*

The case of Gardner vs. Collins *et al.*, 2 Peters' Rep. 58, furnishes the construction given by the Supreme Court of the United States upon the following words contained in the Statute of Descents of Rhode Island, of 1822, to-wit: " When the title to any estate of inheritance, as to which the person having such title shall die intestate, came by *descent, gift* or *devise* from the parent or other kindred of the intestate, and such intestate die without children, such estate shall go to the kin next to the intestate of the blood of the person from whom such estate came or descended, if any there be."

The facts in this case were briefly as follows : John Collins, deceased, in the will which he left, devised the estate in question to his daughter Mary Collins. Mary Collins intermarried with Caleb Gardner, and subsequently died intestate, leaving issue of said marriage, John C. Gardner, George Gardner and Mary C. Gardner, who took the said estate by descent from their mother. John C. Gardner died intestate and without issue, and his part of the estate descended to and vested in his surviving brother and sister, viz: George Gardner and Mary C. Gardner. George Gardner then died intestate and without issue, and his part of the estate descended to and vested in his surviving sister, Mary C. Gardner. Last of all, Mary C. Gardner died intestate and without issue. Caleb Gardner, by

a former marriage, had children. who survived Mary C. Gardner, the last surviving child of the marriage of the said Caleb Gardner and Mary Collins, which children of the former marriage were of course the brothers and sisters of the half-blood of the said Mary C. Gardner.  As to that portion of the estate which came by immediate descent to Mary C. Gardner from her mother there was no dispute, but as to the two thirds which she inherited from her two brothers who died intestate, a dispute arose between the brothers and sisters of the half-blood and the uncle and aunt of the intestate, Mary C. Gardner, the latter asserting that the whole estate, as well the two thirds which she inherited from her two brothers, as the one third which fell to her by immediate descent from her mother, was such a descent from the mother as entitled them as the nearest of kin of her blood, in exclusion of brothers and sisters of Mary C. of the half-blood, who were the nearest of kin of blood to the said Mary C.

To determine this question, it became necessary for the Court to examine and construe that portion of the Statute of Descents of Rhode Island, of 1822, as above set out, to-wit : " When the title to any estate of inheritance, as to which the person having such title shall die intestate, came by *descent, gift* or *devise* from the parent or other kindred of the intestate, and such intestate die without children, such estate shall go to the kin next to the intestate of the blood of the person from whom such estate came or descended." This case, and the one now before the Court, in their more important features, bear a striking resemblance to each other.  In that case, the estate came by descent from Mary Gardner to her three children.  In this case, the estate came by descent from Hardy B. Croom to his two children, William and Henrietta, who survived him.  In that case, the two brothers died before their sister, Mary C., and their part of the estate which they had inherited from

their mother, descended to the said Mary C. In this case, Henrietta died before William Henry, and the part of the estate which she had inherited from her father descended to William Henry. In that case, Mary C. died without issue and intestate. In this case, William Henry died an infant and without issue. In that case, *the defendants* claimed to be entitled to the two thirds of the estate inherited by Mary C. from her two brothers whom she survived, under the Statute of Descents of Rhode Island, of 1822, because, as they contended, it was a descent from the mother, in the meaning of the act, so as, upon the death of Mary C., to cast the descent upon the next of kin of the blood of the mother, as well as to the said two thirds as the one third which descended *directly* to her from her mother. In this case, the defendants claim to be entitled as well to the one half of the real estate which William Henry inherited from his sister, Henrietta Mary, as the one half which descended to him *immediately* from his father, upon the ground that the whole of said real estate, both that which came *directly* from the father, and that which descended from Henrietta, so came within the meaning and operation of the 10th clause of the act of 1829, regulating descents, as to entitle the paternal kindred to the inheritance, in exclusion of the maternal kindred.

It is not often that two cases are found to present, both in the facts and in the legal questions involved, so strong a resemblance ; and we have only traced that resemblance in order that the force with which the decision of the Court in that case applies to this case, upon the question we are now considering, may be fully perceived and acknowledged.

In that case, Judge Story, in delivering the opinion of the Court, says : " As to descents, as well as gifts and devises from a parent, it is plain that the act looks only to the immediate descent or title. A descent *from* a parent

to a child, cannot be construed to mean a descent *through* and not *from* a parent. So a gift or devise *from* a parent, must be construed to mean a gift or devise by the act of the parent, and not by that of some other ancestor more remote, passing through the parent."

That the words *descent, gift* and *devise* may be construed distributively, so that in cases of *descents*, the party who shall inherit is to be of the blood of the first purchaser, from whom by intermediate descents it was passed to the intestate, and that cases of *gifts* or *devises*, the donor or devisor shall alone be the person whose blood is to be enquired for, is a construction, says Judge Story, which the clause may be admitted to be susceptible of, without any great violation of its terms. But, he continues, " we do not think that such is the natural construction of the terms, nor is any legislative intention disclosed which would justify us in adopting it." He further says, "As to the distinction between descents, and gifts and devises, it is true, that in a sense an estate may be said to come by descent from a remote ancestor to a person upon whom it has devolved, through many intermediate descents. But this, if not loose language, is not that sense which is ordinarily annexed to the term. When an estate is said to have descended from A. to B., the natural and obvious meaning of the words is, that it is an *immediate* descent from A. to B."

The learned Judge proceeds to say, that " if other words of a statute should seem to require another and more enlarged meaning, there would be no absolute impropriety in adopting it, but if the true sense is to be sought from the very terms, '*per se*,' that which is the usual sense would seem most proper to be followed. It is not for Courts of Justice to indulge in any latitude of construction, where the words do not naturally justify it, and there is no express legislative intention to guide them.

23

But," says the learned Judge, " we think that the connection in which the words stand, justify us in adhering to the ordinary interpretation. If in cases of gifts and devises, the blood of the proximate donor or devisor is alone to be regarded, there being no distinction pointed out in the words of the Act, between those cases and that of descents, the very juxta-position of the words affords a strong presumption that the Legislature intended to apply the same rule as to all. If the object was to regard the blood of the party from whom the estate was derived, what reason is there to suppose that the Legislature intended less regard to the blood of a devisor or donor than to that of an ancestor? The mischief might be as great in suffering the estate to pass into the hands of strangers, when there were next of kin of the blood in the one case as in the other."

The decision in this case is so strongly in point, and so directly applicable to the question now under consideration, that if it be based upon sound reason and law, as we think it is, its authority cannot be easily denied or resisted.

It is becoming here to remark, that the case of Stewart *vs.* Jones, 8 Gill. and Johnson Rep. 1, cited and relied on by the defendants, does indeed decide that *mediate* descents are embraced in the act of descents of Maryland, of 1786, but it is to be observed that the Maryland statute employs the words, " estate descended to the intestate *on the part* of the father," while our statute employs the terms " descent from the father." So it may be very well conceded that the case of Stewart and Jones affords a sound construction of the statute of descents in Maryland, while the case of Gardner *vs.* Collins may be considered as affording a safe and satisfactory rule for the construction of our statute of descents.

For the reasons above set forth, we are of the opinion that the words "descent from the father," as employed in our

statute of descents, must be construed to mean an *immediate* descent from the father, and that the real estate which William Henry Croom derived by descent from his sister, Henrietta Mary, does not come within the operation of the tenth clause of the Act of 1829, regulating descents, so as, upon the death of William Henry, without issue, to secure the descent to the paternal, in exclusion of the maternal kindred.

In view of the conclusions already announced upon the question of survivorship, it becomes unnecessary to consider the point presented, which involves the interpretation of our statute of distribution. It remains, therefore, only to enunciate the rulings of the Court, upon the several points made in the pleadings. They are as follows :

1. That in the common calamity, by which they all perished, Hardy B. Croom survived his wife Frances, and his daughter Justina; that the daughter Henrietta Mary, and the son Wm. Henry, survived their father, and that William Henry survived his sister Henrietta Mary, and was the last survivor of the family, who all perished.

2. That the domicil of succession of Hardy B. Croom, at the date of his decease, was in the State of North Carolina, and not in the, then, Territory of Florida, and that the domicil of the father at the time of his death, was the domicil of his two children, who survived him—Henrietta Mary and William Henry.

3. That the words contained in the tenth clause of the statute regulating descents, in this State, are to be construed to mean an . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . decree of the Chancellor ordering the bill in this cause to be dismissed, be *reversed*, and that the cause be remanded, with direction to proceed therein in accordance with the rulings contained in this opinion.

*Note by Justice DuPont.*—It is due to the Hon. J. J. Finley, the Circuit Judge of the Western Circuit, who sat at the hearing of this case in the place of the Chief Justice, who was disqualified, to state, that the entire argument upon the construction of the statute of descents, contained in the foregoing opinion, was prepared by him.